# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CLIFFORD ELOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12721-VCMR |
| | ) | |
| EXPRESS SCRIPTS HOLDING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| AMITKUMAR KHANDHAR, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 12734-VCMR |
| | ) | |
| v. | ) | |
| | ) | |
| EXPRESS SCRIPTS HOLDING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  April 26, 2017
Date Decided:  May 31, 2017

Peter B. Andrews, Craig J. Springer, and David M. Sborz, ANDREWS & SPRINGER, LLC, Wilmington, Delaware; Jeffrey M. Norton and Roger A. Sachar Jr., NEWMAN FERRARA LLP, New York, New York; *Attorneys for Plaintiff Clifford Elow.*

Peter B. Andrews, Craig J. Springer, and David M. Sborz, ANDREWS & SPRINGER, LLC, Wilmington, Delaware; Melinda A. Nicholson and Michael R. Robinson, KAHN SWICK & FOTI, LLC, Madisonville, Louisiana; *Attorneys for Plaintiff Amitkumar Khandhar.*

Paul J. Lockwood and Jenness E. Parker, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Jay B. Kasner and Scott D. Musoff, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for Defendant.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case involves two demands to inspect the books and records of a pharmacy benefit management company. The plaintiffs seek numerous books and records to investigate potential mismanagement based on pleadings in other legal actions involving the defendant company and public statements made by the company's management. The defendant company argues that one of the plaintiff's demands is improper and does not meet the form and manner requirements of the statute. The defendant further argues that both demands have an improper purpose and lack a credible basis to infer wrongdoing. Defendant also challenges the broad scope of the inspection demands.

This memorandum opinion contains my findings and conclusions following a one-day trial. For the reasons discussed herein, I find that one plaintiff's demand does not meet the form and manner requirements; therefore, he is not entitled to inspection. The other plaintiff's demand meets the form and manner requirements, states a proper purpose, and entitles him to inspect all books and records necessary and sufficient to investigate potential managerial wrongdoing.

## I. BACKGROUND

These are my findings of fact after a one-day trial based on the parties' stipulations and 74 exhibits. I accord the evidence the weight and credibility I find it deserves.[1]

### A. The Parties and Relevant Non-Parties

Plaintiff Clifford Elow has been a stockholder of Express Scripts Holding Company ("Express Scripts" or the "Company") since April 2012.[2] Plaintiff Amitkumar Khandhar also purports to own Express Scripts stock.

Defendant Express Scripts is a Delaware corporation headquartered in St. Louis, Missouri. Express Scripts provides pharmacy benefit management ("PBM") services. David Queller is the Senior Vice President of Sales and Account Management for Express Scripts. George Paz is the former Chairman and Chief Executive Officer of Express Scripts. Tim Wentworth is President of Express Scripts.

---

[1] After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Exhibits are cited as "JX #," and facts drawn from the parties' Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2] PTO ¶ 2.

Non-party Anthem, Inc. ("Anthem"), previously WellPoint, Inc. ("WellPoint"), is Express Scripts's largest commercial client. Non-party Express Scripts, Inc. ("ESI") is a wholly-owned subsidiary of Express Scripts.

## B.     The Anthem Relationship

In 2009, Express Scripts entered into a ten-year contract with Anthem to provide PBM services to certain Anthem health plans. Anthem is a large client for ESI in the PBM services space. Revenues from the contract represented approximately 12.2%, 14%, 16.6%, 17%, and 18% of Express Scripts's consolidated revenue for the years 2013, 2014, 2015, 2016, and the three months ended March 31, 2017, respectively. Anthem's contribution to the Company's profitability is expected to "continue to increase . . . as the contract nears its termination in 2019."[3]

Section 3.1(a) of the Anthem contract requires ESI to "perform services under the Agreement 'in a prudent and expert manner in accordance with this Agreement and all Laws.'"[4] The agreement also creates a "periodic pricing review" procedure, which gives Anthem the ability to propose adjustments to

---

[3]     Letter to Vice Chancellor Montgomery-Reeves Ex. B, at 27 (April 26, 2017) (Express Scripts Form 10-Q for Quarter ended March 31, 2017) (hereinafter "Letter"); JX 44, at 72.

[4]     JX 22, ¶ 6.

the pricing schedule every three years.[5]  Section 5.6 of the agreement

provides:

> [Anthem] or a third party consultant retained by
> Anthem will conduct a market analysis every three
> (3) years during the Term of this Agreement to
> ensure that [Anthem] is receiving competitive
> benchmark pricing.  In the event [Anthem] or its
> third party consultant determines that such pricing
> terms are not competitive, [Anthem] shall have the
> ability to propose renegotiated pricing terms to
> [ESI] and [Anthem] and [ESI] agrees to negotiate in
> good faith over the proposed new pricing terms.
> Notwithstanding the foregoing, to be effective any
> new pricing must be agreed to by [ESI] in writing.[6]

In 2012, ESI and Anthem reached an agreement after Anthem's first periodic

pricing review.[7]

In 2015, Express Scripts and Anthem started the same negotiation

process in anticipation of the 2015 pricing review.[8]  Aware of this process

through comments made by Anthem, analysts began asking Express Scripts

questions about the Anthem contract and relationship.[9]  On February 25, 2015,

during an investor call, Queller stated that Express Scripts had

---

[5]     PTO ¶ 5.

[6]     *Id.*

[7]     JX 37, at 4.

[8]     *Id.*; JX 78, at 5.

[9]     JX 37, at 4; JX 25, ¶ 192.

6

a great relationship with Anthem. We're right now working with them very closely to help them prepare for their 1/1/16 business . . . [o]ur teams work together closely each and every day. The relationship is very, very solid. . . . we don't think that it's appropriate to talk out in public about our relationship from that regard. And we look forward to having them as a client through the end of the contract term which is at the end of 2019.[10]

On July 29, 2015, during a second-quarter earnings call, Wentworth stated that Express Scripts continued "close collaboration" with its clients and that "performance to date and the positive feedback we continue to receive gives us confidence that we will have strong retention across the board."[11] During the third-quarter earnings call on October 28, 2015, Wentworth stated that the Company's "strong client relationship positions us well for 2016" and "based on our results this year, we are confident about next year's selling and retention season."[12] Paz, the Chairman of the board at that time, was present on all of the relevant calls.[13]

---

[10]  JX 75, at 2; JX 33, at 33.

[11]  JX 75, at 2; JX 35, at 4.

[12]  JX 75, at 3; JX 36, at 5.

[13]  JX 33, at 2; JX 35, at 2; JX 36, at 2.

## C. Litigation Ensues

The second renegotiation did not go as well as the first. On March 21, 2016, Anthem initiated litigation in the United States District Court for the Southern District of New York, alleging that ESI had breached the agreement (the "Anthem Action").[14] The Anthem complaint alleges that ESI acted in bad faith and materially breached Section 5.6 by (1) delaying the repricing process for months; (2) refusing to negotiate over Anthem's pricing proposals for competitive benchmark pricing or in excess of the competitive benchmark pricing; (3) repudiating its contractual obligations to reprice the contract to ensure Anthem's receipt of competitive benchmark pricing; and (4) failing to offer "anything remotely close to competitive benchmark pricing as required."[15] The complaint also alleges ESI breached Section 3.1(a)'s requirement that ESI perform its operational duties in a "prudent and expert manner" due to its systems defects, consistent failure to devote sufficient resources to its work, inadequate training of its personnel, extremely high employee turnover, and lack of required expertise.[16] These breaches, Anthem contends, have placed it at significant risk of enforcement actions by the

---

[14]    PTO ¶ 6; JX 22.

[15]    JX 22, ¶ 4.

[16]    *Id.* ¶ 6.

8

Centers for Medicare & Medicaid Services ("CMS") and caused hundreds of millions of dollars in damages.[17] Anthem purportedly notified ESI of its breaches of the contract on February 16, 2015 and April 1, 2015.[18]

On June 13, 2016, ESI answered the complaint and asserted counterclaims.[19] ESI admits that it received the notices of breach from Anthem and "respectfully refers the Court to the document[s] referred to therein for an accurate description of [their] terms."[20] ESI contends that Anthem agreed to a higher contract price over the term of the contract in exchange for more up-front cash and now attempts to re-write the agreement.[21] ESI avers that it is not obligated to accept Anthem's proposals of new pricing terms every three years; instead, it must negotiate in good faith, which it did when it made five counterproposals before March 2016.[22] And Anthem, not ESI, failed to negotiate in good faith by (1) taking aggressive positions in 2014 (before the ability to trigger the periodic pricing review) that

---

[17]    *Id.*

[18]    JX 54, ¶ 7; JX 22, ¶ 24; JX 25, ¶¶ 45, 74.

[19]    JX 25.

[20]    *Id.* ¶¶ 45, 74.

[21]    *Id.* ¶¶ 2-3.

[22]    *Id.* ¶¶ 4-5.

9

were incompatible with the plain terms of the agreement and (2) demanding approximately \$12-13 billion—\$3 billion a year over the next four years of the contract—from ESI, while Anthem employees were stating publicly that they expected to receive less than \$3 billion total.[23]

ESI also contends that any "operational breaches" are not supported by the facts because Anthem's Medicare "star rating" with CMS has improved over this period, and Anthem has received no sanctions or penalties (in contrast with its competitors).[24] ESI asserts that any operational issues were isolated. And those operational issues resulted from the massive volume of Anthem's transactions and the complex nature of Anthem's plans and requirements.[25] ESI points to the lack of allegations regarding any missed ESI "performance guarantees," which require that ESI deliver a certain level of performance and impose a monetary penalty for anything less.[26]

On May 4, 2016, a class action lawsuit was filed in the same court (the "Securities Action"). It alleges that Express Scripts violated Federal securities laws by telling investors the Anthem relationship was strong and accounting

---

[23]  *Id.* ¶¶ 5-6, 8, 191-96.

[24]  *Id.* ¶¶ 12-13.

[25]  *Id.*

[26]  *Id.* ¶¶ 14-15.

for the Anthem agreement's renewal in publicly-filed financial statements. The complaint further alleges that during this time, Express Scripts's management knew that the 2012-2013 pricing negotiations severely damaged the parties' relationship, that the Company had received two formal notices of breach, and that Anthem demanded a $15 billion pricing concession.[27] The complaint further alleges that the relationship continued to deteriorate throughout 2015, but the parties could not resolve their dispute.[28] The investors only learned of these issues in January 2016, when Anthem publicly threatened to terminate its contract with Express Scripts.[29]

### D. Procedural History

On May 18, 2016, Elow sent a books and records inspection demand to ESI.[30] On July 28, 2016, Khandhar sent a books and records inspection demand to Express Scripts.[31] On August 9, 2016, Express Scripts rejected Khandhar's demand.[32] On August 12, 2016, Elow filed a complaint pursuant

---

[27] PTO ¶ 7; JX 45; JX 54.

[28] JX 54 ¶ 12.

[29] *Id.* ¶ 13.

[30] PTO ¶ 8; JX 5.

[31] PTO ¶ 9; JX 13.

[32] PTO ¶ 10.

11

to Section 220 against ESI.[33]  On August 17, 2016, Khandhar responded by letter.[34]  On August 24, 2016, Elow voluntarily dismissed his complaint, and on August 25, 2016, Elow made demand on Express Scripts to inspect its books and records.[35]  On September 1, 2016, Express Scripts denied Elow's demand, and Elow filed the complaint in this action on September 6, 2016.[36]  On September 7, 2016, Express Scripts again rejected Khandhar's demand, and Khandhar filed his complaint in this action on September 8, 2016.[37]  No books or records have been produced by Express Scripts in response to Khandhar or Elow's demands.  On October 4, 2016, this Court consolidated the actions for pre-trial purposes.[38]  This Court held trial in both actions on March 3, 2017.  On April 26, 2017, Elow and Khandhar submitted a letter to the Court attaching the Company's updated financial filings that were relevant to the assertions in this action.

---

[33]     *Id.* ¶ 14.

[34]     *Id.*

[35]     *Id.* ¶¶ 14-15.

[36]     *Id.* ¶¶ 16, 18.

[37]     *Id.* ¶¶ 12, 19.

[38]     *Id.* ¶ 20.

## II.    ANALYSIS

Section 220 of Delaware General Corporation Law provides stockholders of a Delaware Corporation with the right to inspect the books and records of a Company for any proper purpose.[39]  A proper purpose for a demand to inspect books and records "shall mean a purpose reasonably related to such person's interest as a stockholder."[40]

> Where the stockholder seeks to inspect the corporation's books and records, other than its stock ledger or list of stockholders, such stockholder shall first establish that:
>
> (1) Such stockholder is a stockholder;
>
> (2) Such stockholder has complied with this section respecting the form and manner of making demand for inspection of such documents; and
>
> (3) The inspection such stockholder seeks is for a proper purpose.[41]

### A.    Khandhar's Demand Does Not Satisfy Section 220's Form and Manner Requirements

As to the form and manner requirements of Section 220, "[t]he statute requires the documentary evidence [of beneficial ownership of stock] to

---

[39]    8 *Del. C.* § 220.

[40]    *Id.* § 220(b).

[41]    *Id.* § 220(c).

accompany the demand for inspection."[42] "Delaware courts require strict adherence to the section 220 inspection demand procedural requirements."[43] These requirements "protect 'corporations from improper demands by requiring that *evidence of beneficial ownership be both furnished with the demand and provided under oath.*'"[44] "The purpose of § 220 is not served if the shareholder supplies a document that does not actually evidence that she is the beneficial owner of the company's stock on the relevant date."[45]

In *Central Laborers Pension Fund v. News Corp.*, the statute's requirements were not followed when the demand did not include evidence of beneficial ownership, among other deficiencies.[46] The Delaware Supreme Court held that the plaintiff's subsequent submission of an account statement as proof of beneficial ownership of the defendant corporation's stock did not meet the procedural requirements for an inspection demand.[47] This is because

---

[42]    *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 146 (Del. 2012).

[43]    *Id.* at 145.

[44]    *Id.* (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 873 A.2d 316, 317 (Del. Ch. 2005)) (emphasis in original).

[45]    *Smith v. Horizon Lines, Inc.*, 2009 WL 2913887, at *2 (Del. Ch. Aug. 31, 2009).

[46]    45 A.3d at 146.

[47]    *Id.*

the demand must be in "*proper form before litigation is initiated.*"[48] The "right of the corporation to receive and consider a demand" is defeated and "an integral part of the statute rendered nugatory when . . . an effort to comply with the requirements of form is made during the course of the litigation without delivering new form of demand."[49]

Khandhar's demand does not contain adequate proof of his ownership of Express Script stock. His name is not included anywhere on the attached stock purchase plan document—the purported evidence of his continued stock ownership.[50] Khandhar does not argue that he has made a new form of demand. Thus, Khandhar's demand is improper because it did not comply with the form and manner requirements before the litigation was initiated, and Khandhar may not inspect the books and records sought in this action.

### B. Elow's Demand States a Proper Purpose

Express Scripts raises no challenges to Elow's status as a stockholder or to the form and manner of his inspection demand; thus, I turn to whether Elow has stated a proper purpose under Section 220. Elow's demand states that he seeks inspection of books and records in order to:

---

[48] *Id.* (emphasis in original).

[49] *Id.*

[50] JX 13.

(1) determin[e] whether the Company's officers and/or directors have properly discharged their fiduciary duties to the Company; (2) obtain information to determine whether or not the Company's officers and/or directors are independent and disinterested, and whether they have acted in good faith; and (3) take any appropriate action in the event that any wrongdoing is revealed, including instituting a derivate suit with allegations that a pre-litigation demand on the board of directors (the "Board") of Express Scripts should be excused, and (if such suit is filed) to provide the court with particularized allegations from which to evaluate the demand-excused issue.[51]

"[A] stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence."[52] "It is well-established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[53] "A stockholder is 'not required to prove by a preponderance of the evidence that waste and mismanagement are actually occurring.'"[54] The stockholder must only show "some evidence" to establish "a credible basis from which the Court of Chancery can infer there is possible mismanagement

---

[51]    JX 75, at 1.

[52]    *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

[53]    *Id.* (quoting *Nodana v. Petroleum Corp. v. State ex rel. Brennan*, 123 A.2d 243, 246 (Del. 1956)).

[54]    *Id.* at 123 (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co. Inc.*, 681 A.2d 1026, 1031 (Del. 1996)).

16

that would warrant further investigation."[55] The "credible basis" standard "sets the lowest possible burden of proof."[56] In deciding whether a credible basis exists to infer mismanagement or wrongdoing, the "threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[57] "The trial court may rely on 'circumstantial evidence,'" and "[h]earsay statements may be considered, provided they are sufficiently reliable."[58]

Elow seeks to investigate whether officers and directors breached their fiduciary duties by (1) allowing ESI to breach its contractual obligations to service Anthem's customers in a prudent and expert manner and to engage in good faith benchmark pricing negotiations; (2) failing to prevent ESI's breaches despite a known duty to act in the face of knowledge about the issues

---

[55] *Id.* at 123; *see also Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007).

[56] *Seinfeld*, 909 A.2d at 123.

[57] *Id.* (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)) (internal quotation marks omitted).

[58] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 778 (Del. Ch. 2016) (citing *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004); *Thomas & Betts*, 681 A.2d at 1032-33; *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 208-13 (Del. Ch. 1976)).

with Anthem; and (3) communicating dishonestly with the stockholders regarding the Anthem contract and customer retention.[59]

In support of this claim, Elow points to the pleadings in the Anthem Action, the Securities Action complaints, and public statements made by Express Scripts.[60] Elow argues that "it is irrelevant whether the allegations will ultimately be proved true in a court of law;" the totality of the allegations and public statements make wrongdoing plausible and, thus, establishes a credible basis.[61] Elow states that the Anthem allegations, coupled with ESI's

---

[59] Elow's Opening Br. 31-32.

[60] *Id.* at 33. Express Scripts argues that the Anthem complaint is inadmissible hearsay. Express Scripts Opening Br. 34-36. Elow, however, is not relying solely on the Anthem complaint's allegations to prove that there is a credible basis from which to infer a possible breach or mismanagement. Elow also points to ESI's own admissions in the pleadings and Express Scripts management's public statements to show there is a credible basis to infer that a dispute regarding the Anthem contract occurred and that certain misleading representations were made to the public regarding that relationship. Additionally, in *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, the Delaware Supreme Court affirmed this Court's consideration of hearsay testimony and its ultimate decision to discredit that testimony as unworthy of belief. 681 A.2d 1026, 1032 (Del. 1996). *See also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 778 (Del. Ch. 2016); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004) ("In [*Thomas & Betts*], the Supreme Court indicated that, had this Court found the disputed testimony reliable, it could properly have considered the hearsay testimony to determine whether there was a credible basis to infer that mismanagement had occurred."); *Skoglund v. Ormund, Indus., Inc.*, 372 A.2d 204, 208-13 (Del. Ch. 1976)).

[61] Elow's Opening Br. 33-34. Express Scripts argues that the filing of a complaint is not enough to support a "credible basis" from which to infer wrongdoing. Express Scripts's Opening Br. 37 (citing *Graulich v. Dell Inc.*,

18

own answer and counterclaims, create the inference that there were "numerous problems with ESI's administration of the Agreement" and its "negotiation over the Agreement's competitive benchmark pricing provision."[62]

Elow also asserts that ESI's own admissions and contentions in the Anthem Action are evidence that the Company's representatives misled investors about the relationship with Anthem.[63] Specifically, Elow argues that Express Scripts was telling the public that Express Scripts had "a great relationship with Anthem," that Express Scripts was "look[ing] forward to having them as a client through the end of the contract term which is at the end of 2019," and that "[t]he relationship is very, very solid."[64] But, in reality, Anthem already had served ESI with notices "detailing numerous operational breaches of the Agreement" and had threatened to terminate the agreement if the breaches were not cured.[65]

---

2011 WL 1843813, at *5, n.49 (Del. Ch. May 16, 2011)). Here, however, Elow is not relying solely on the complaint to show a credible basis. Elow also points to ESI's own answer and counterclaims and the public statements of Express Scripts's management. *See supra* note 60.

[62] Elow's Answering Br. 6; JXS 22, 25-29.

[63] Elow's Answering Br. 6-7.

[64] JX 75, at 2.

[65] Elow's Opening Br. 11.

By July 2015, Express Scripts communicated to the public that it was in "close collaboration" with its clients and that "performance to date and the positive feedback we continue to receive gives us confidence that we will have strong retention across the board."[66] Express Scripts also represented that the Company's "strong client relationship positions us well for 2016," and "based on our results this year, we are confident about next year's selling and retention season."[67] But these statements gave a false impression, Elow argues, because Anthem (a customer that represented approximately $17 billion of Express Scripts's $100 billion in annual revenue) had sent a second notice of breach on April 1, 2015 and a demand for $12-13 billion in pricing concessions over the next four years of the agreement.[68]

Defendant has made numerous arguments and presented evidence challenging the merits of the underlying claims. But, at this stage, I cannot analyze the strength of the merits of the potential underlying claims. Instead, I must determine if the plaintiff has put forth "some evidence" to establish "a credible basis from which the Court of Chancery can infer there is possible

---

[66]   JX 75, at 2.

[67]   *Id.* at 3.

[68]   Elow's Opening Br. 13; JX 22, at ¶ 24; JX 25, at ¶ 45; Letter Ex. A, at 8; Ex. B, at 27.

mismanagement that would warrant further investigation" through "documents, logic, testimony or otherwise."[69] Elow has asked to investigate a serious allegation that the largest client of the Company terminated its contract because ESI refused to negotiate in good faith and did not work adequately to cure the operational breaches. At the same time this relationship was deteriorating by ESI's own admissions, Express Scripts allegedly was representing to the market that the relationship was strong, the contract would continue, and the future with the client looked bright.[70] I conclude that the pleadings in the Anthem Action, coupled with the statements made by Express Scripts's management, are enough to meet the "lowest burden of proof" set by Delaware law.[71]

Express Scripts also argues that these purposes are not in fact Elow's true purposes, but that they are sham purposes constructed by the lawyers to maintain this action.[72] Express Scripts does not point to any credible evidence of such a scheme, and I do not find any merit to the argument that Elow should

---

[69] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006).

[70] JX 25; JX 33; JX 75.

[71] *Seinfeld*, 909 A.2d at 123.

[72] Express Scripts's Opening Br. 21-29; Express Scripts's Answering Br. 11-12.

be precluded from obtaining documents as a stockholder because his true purpose is to maintain this action on behalf of his lawyers. Elow is within his rights to rely on counsel's advice in making a demand, prosecuting this action, and determining next steps.[73]

## C. The Document Requests Must Be Narrowly Tailored to Elow's Purpose

Because I conclude that Elow has shown a proper purpose for his inspection, I now turn to the documents requested. In his demand, Elow seeks the following documents from January 1, 2015 until the present:

1. Books and records created or dated during the Relevant Period related to any proceedings of the Express Scripts Board or a committee of the Board, if those proceedings in any way relate to the Company's relationship with Anthem, or its predecessor, WellPoint, Inc.

2. Books and records created or dated during the Relevant Period related to any proceedings of the Express Scripts Board or a committee of the Board, if those proceedings in any way relate to the Company's use of C360 and/or Foundation 14.

---

[73] Express Scripts also asserts that Elow does not have an ultimate use for these documents while conceding that Elow's demand suggests he will use the documents to inform his decision of whether to pursue legal action. Express Scripts's Answering Br. 12-13; Oral Arg. Tr. 92. Express Scripts argues that Elow's subsequent testimony contradicts the demand letter because he states he is merely "considering" derivative litigation as an option. Elow does not explain how this is contradictory or why a stockholder would need to know prior to an inspection whether he or she definitively will pursue litigation no matter what the documents revealed.

3. Books and records created or dated during the Relevant Period related to any proceedings of the Express Scripts Board or a committee of the Board, if those proceedings in any way relate to Super PA.

4. Books and records created or dated during the Relevant Period related to any proceedings of the Express Scripts Board or a committee of the Board, if those proceedings in any way relate to the submission of reports to CMS.

5. A copy of the Company's Code of Ethics and/or Code of Conduct, to the extent one exists.[74]

At trial, counsel for Elow stated that "books and records" included communications, such as e-mails, of all of the board members relating to these issues.[75]

"The burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is essential and sufficient to the party's stated purpose."[76] "It is the responsibility of the trial court to tailor the inspection to the stockholder's stated purpose."[77] "The plaintiff can obtain books and records that 'address the crux of the

---

[74] JX 75, at 4.

[75] Tr. 86.

[76] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[77] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 787 (Del. Ch. 2016) (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del. 1997)).

shareholder's purpose and if that information is unavailable from another source.'"[78]

Here, Elow seeks a broad set of documents, essentially any director or officer books or records, including communications, connected to any board or committee proceedings relating to Anthem, C360, Foundation 14, Super PA, or any submission of reports to CMS.[79] Elow, however, has only shown that board or committee packages (including agendas, minutes, or presentations) relating to the Anthem relationship dated from January 1, 2015 until the present are essential for purposes of this Section 220 demand. This necessarily includes documents regarding C360, Foundation 14, Super PA, or submission of reports to CMS *as they relate to the Anthem relationship*. Elow also may obtain the Company's code of ethics or conduct. Elow is not entitled to any documents about these products or topics if the documents are not relevant to Anthem or Anthem's use of the products. Elow has not demonstrated that broader categories of documents or communications not

---

[78]     *Id.* at 788 (quoting *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014)).

[79]     Elow's Opening Br. 37-38; JX 75, at 4.

included in board packages are necessary. I condition the request upon the parties' negotiation of a reasonable confidentiality order.[80]

Express Scripts asks that any production be incorporated by reference into any future derivative complaint. [81] Under Section 220(c) of the DGCL, "the Court of Chancery 'may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper.'"[82] "This court has used conditions as part of its effort to 'maintain a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement and the rights of directors to manage the business of the corporation without undue interference from stockholders.'"[83]

---

[80] *See Yahoo!*, 132 A.3d at 796-97 ("[T]here is a presumption that the production of books and records pursuant to section 220 should be 'conditioned upon a reasonable confidentiality order.'") (quoting 1 EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 220.06, at 7-238.1)) (internal quotation marks omitted).

[81] Express Scripts's Opening Br. 28-29.

[82] *Yahoo!*, 132 A.3d at 796 (quoting 8 *Del. C.* § 220(c)).

[83] *Id.* (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006)). "One common limitation is to condition production on the stockholder entering into a confidentiality agreement." *Id.* at 796-97 (citing *CM & M Gp., Inc. v. Carroll,* 453 A.2d 788, 793–94 (Del. 1982)). "More recently, the Delaware Supreme Court held that this court can condition a Section 220 production on the plaintiff agreeing to file any subsequent derivative action in a Delaware court." *Id.* (citing *United Techs. Corp. v. Treppel*, 109 A.3d 553, 558–59 (Del. 2014)).

25

In *Yahoo!*, this Court granted a request to incorporate any production of documents into any subsequent derivative complaint because it "protects the legitimate interests of both [the defendant] and the judiciary by ensuring that any complaint that [the plaintiff] files will not be based on cherry-picked documents."[84] The Court analyzed this step as a logical extension of the incorporation-by-reference doctrine that has been used to allow "a court to consider documents that have been incorporated by reference in a complaint when ruling on a motion to dismiss."[85] The doctrine "permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one" and "limits the ability of the plaintiff to take language out of context, because the defendants can point the court to the entire document."[86] In support of its reasoning, the Court pointed to "an approach that Delaware decisions have taken when ruling on motions to dismiss after plaintiffs have

---

[84] *Id.* at 797 (citing *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 658 n.3 (Del. Ch. 2013); *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003)).

[85] *Id.*

[86] *Id.* (citing *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169-70 (Del. 2006); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995)).

taken expedited discovery in support of preliminary injunction applications."[87] For example, in the *Morton's* case, then-Chancellor Strine treated discovery material that plaintiffs obtained in connection with their preliminary injunction application and relied on when formulating their complaint as incorporated by reference in the complaint for purposes of the Court's decision on the motion to dismiss.[88] The *Yahoo!* Court held that "[t]he Incorporation Condition accomplishes the same result for the materials generated by the pre-suit investigation that [plaintiff] is conducting using Section 220."[89]

The Court, however, warned that this does not change the pleading standards or alter the inferences the Court must take in plaintiff's favor in the Rule 12(b)(6) and Rule 23.1 contexts, namely that all well-pled and particularized factual allegations will be taken as true, respectively.[90] "[I]f a document or the circumstances support more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives

---

[87]   *Id.* at 798 (citing *In re Gardner Denver, Inc.*, 2014 WL 715705, at *8 (Del. Ch. Feb. 21, 2014; *Morton's*, 74 A.3d at 658 n.3; *Simplexity, LLC v. Zeinfeld*, 2013 WL 5702374, at *1 n.2 (Del. Ch. Oct. 17, 2013)).

[88]   *Id.* at 798-99 (citing *Morton's*, 74 A.3d at 658 n.3).

[89]   *Id.* at 799.

[90]   *Id.* at 798.

the inference."[91]  Further, this is not "an invitation for the defendants in a future action to file an appendix containing the entire Section 220 production in support of their motion to dismiss."[92]  Instead, the plaintiff "can and should file a complaint, if it chooses to do so, as if the Incorporation Condition had not been imposed."[93]  "Defense counsel must then use judgment and supply the court only with the limited documents (if any) necessary to show that it would not be reasonable to draw a particular inference on which the complaint depends."[94]  "In the end, the only effect of the Incorporation Condition will be to ensure that the plaintiff cannot seize on a document, take it out of context, and insist on an unreasonable inference that the court could not draw if it considered related documents."[95]  I follow that reasoning and apply the incorporation-by-reference doctrine to this case.

## III.  CONCLUSION

For the reasons discussed above, I deny Khandhar's demand to inspect the books and records of Express Scripts and grant Elow's demand subject to

---

[91]     *Id.*

[92]     *Id.* at 799.

[93]     *Id.*

[94]     *Id.*

[95]     *Id.*

a confidentiality order and the incorporation-by-reference doctrine. Parties shall submit a conforming order within 10 days.

**IT IS SO ORDERED.**