Martin MELZER, and Rollin
Linderman, Plaintiffs

v.

CNET NETWORKS, INC., a Delaware
corporation, Defendant.

Civil Action No. 3023–CC.

Court of Chancery of Delaware.

Date Submitted: Nov. 13, 2007.
Date Decided: Nov. 21, 2007.

See also 483 F.Supp.2d 947.

David L. Finger and Charles Slanina, of Finger & Slanina, LLC, Wilmington, DE; Travis E, Downs III, Randall J. Baron,

Kathleen A. Herkenhoff, Benny C. Goodman III, and Mary Lynne Calkins, of Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Diego, CA, of counsel, for Plaintiffs.

Kevin G. Abrams and Nathan A. Cook, of Abrams & Laster, LLP, Wilmington, DE; Patrick E. Gibbs, Philip J. Wang, and Andrew M. Farthing, of Latham & Watkins, LLP, Menlo Park, CA, of counsel, for Defendant.

***OPINION***

CHANDLER, Chancellor.

This should have been a very easy case. Plaintiffs, who are shareholders of CNET, initiated this action under 8 *Del. C.* § 220 to seek books and records relating to stock options backdating—a practice in which the company has already admitted it engaged—after being ordered to do so by a federal judge in California. This seeming simplicity notwithstanding, CNET opposed the demand for inspection, the parties battled over discovery via a contentious motion to compel, and only on the brink of trial did CNET agree to share certain documents with plaintiffs. This agreement was not, however, all encompassing, and now the parties dispute the scope of books and records to which plaintiffs are entitled. Summarized as succinctly as possible, the issue is whether plaintiffs are entitled to documents relating to options granted before plaintiffs owned stock in CNET. Because plaintiffs' purpose in this action is to obtain the particularized facts they need to adequately allege demand futility (rather than to investigate potential claims that plaintiffs have no standing to assert), plaintiffs may have access to certain documents pertaining to options granted before they owned shares.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case, like so many others concerning backdated stock options, found its genesis in a March 18, 2006 article in the *Wall Street Journal* that suggested many large corporations were engaging in an options-granting practice that contravened corporate charters far and wide.[1] That article and its findings have led to the filing of numerous federal and state law actions and to well over one hundred SEC investigations.[2] This case is somewhat unique, however, because here the defendant corporation has admitted that it engaged in backdating stock options granted from the time of its IPO in 1996 through at least 2003.

CNET's options issues first came to light in May 2006, when the Center for Financial Research and Accountability ("CFRA") published an analysis of option-granting practices of one hundred publicly traded companies. The CFRA report specifically identified CNET as a company whose pattern of granting options indicated backdating. On June 27, 2006, CNET disclosed that its option granting practices were under investigation by the U.S. Attorney for the Northern District of California and by the Securities and Exchange Commission. The next month, CNET announced that an internal investigation conducted by a special committee confirmed the CFRA report and announced that the company would need to restate its financial statements from 2003–05. In mid-October 2006, CNET released further, more specific findings from the special committee, which concluded backdating had been a problem for the company from the time of its IPO in 1996.

On June 19, 2006, plaintiffs filed their initial complaint in the District Court for the Northern District of California alleging federal securities and state law claims against CNET and its directors relating to backdated stock options.[3] After CNET's disclosures in the fall, plaintiffs amended their derivative complaint, and the defendants moved to dismiss for failure to make a demand on the CNET board. Applying the *Aronson*[4] test for demand futility, the district court granted the motion to dismiss.[5]

Plaintiffs had alleged several theories to support their contention that demand on the CNET board would have been futile. First, to the extent a director materially benefited from a backdated option, he or she would not be disinterested under the first prong of the *Aronson* test.[6] Thus, to the extent that plaintiffs could plead with particularity facts demonstrating that a majority of the directors received backdated options, demand would be excused. Second, to the extent a director knowingly backdated a stock option in violation of the company's charter, that director's action is *ultra vires* and is not the product of valid business judgment.[7] If a majority of the

1.  *See* Charles Forelle & James Bandler, *The Perfect Payday*, WALL ST. J., Mar. 18, 2006, at A1.

2.  *See* David I. Walker, *Unpacking Backdating: Economic Analysis and Observations on the Stock Option Scandal*, 87 B.U. L.REV. 561, 563 (2007).

3.  *In re CNET Networks, Inc.*, 483 F.Supp.2d 947, 953 (N.D.Cal.2007).

4.  *Aronson v. Lewis*, 473 A.2d 805 (Del.1984).

5.  *CNET Networks*, 483 F.Supp.2d at 954–55.

6.  *See Grimes v. Donald*, 673 A.2d 1207, 1216 (Del.1996) ("The basis for claiming excusal would normally be that ... a majority of the board has a material financial or familial interest").

7.  *See In re info USA, Inc. S'holders Litig.*, C.A. No. 1956–CC, 2007 WL 2419611, at *15 (Del. Ch. Aug. 20, 2007) ("demand will be excused if a majority of the board that allegedly pur-

current board engaged in backdating, demand would be excused.[8]

Thus, key to establishing demand futility was particularized facts demonstrating that backdating occurred and either that (1) a majority of the current board received backdated options or (2) a majority of the current board engaged in backdating itself. The district court analyzed individually the eight option grants that plaintiffs alleged were backdated and concluded that plaintiffs successfully pleaded particularized facts with respect to only the grants on June 3, 1998, April 17, 2000, and October 8, 2001.[9] Consequently, plaintiffs had demonstrated that only *one* member of the then-current board received backdated options.[10] Judge Alsup also found unpersuasive plaintiffs' attempts to show demand futility under the second prong of *Aronson,* concluding that plaintiffs failed to allege the particularized facts necessary to demonstrate that board members actually engaged in the process of backdating.[11]

After dismissing plaintiffs' amended complaint, however, Judge Alsup granted further leave to amend,[12] and issued a stay pending a books and records demand in Delaware.[13] The stay specifically requested that CNET cooperate and expedite the inspection because "CNET itself raised the availability of such an inspection in its recent memoranda."[14] Judge Alsup listed four categories of books and records that would be helpful in the California action:

1. All books and records showing the extent to which the CNET compensation committee delegated (or did not delegate) to management, either expressly or by custom and practice, the authority to select the exercise price or grant date of stock options under the 1997 plan and, if such delegation occurred, the extent to which the compensation committee was made aware of the exercise prices and dates selected.

2. All books and records establishing the specific chronology and events leading to the stock-option grants alleged in the complaint and exercise prices and grant dates associated therewith.

3. All books and records needed to determine whether Messrs. Colligan and Robison received stock options that were backdated.

4. All books and records necessary to show the extent to which any min-

---

sued the *ultra vires* action remains on the defendant board at the time demand is made").

8. *Ryan v. Gifford,* 918 A.2d 341, 354–55 (Del. Ch.2007) (finding demand futile under the second prong of *Aronson* where the complaint's particularized facts showed that a majority of the current board sat on the compensation committee that granted backdated options in violation of the company's stock option plan).

9. *CNET Networks,* 483 F.Supp.2d at 962.

10. That one member, co-founder Shelby Bonnie, resigned in October 2006. *See SEC Clears CNET,* CFO Magazine, Sept. 5, 2007, at 2.

11. *CNET Networks,* 483 F.Supp.2d at 965 ("Plaintiffs' allegations that because they were on the compensation committee, they must have known, do not constitute particularized facts.").

12. *In re CNET Networks, Inc. S'holder Derivative Litig.,* No. C 06–03817 WHA (N.D.Cal. Apr., 30, 2007) (order allowing leave to amend and denying motion for reconsideration).

13. *In re CNET Networks, Inc. S'holder Derivative Litig.,* No. C 06–03817 WHA (N.D.Cal. May 9, 2007) (stay pending books and records demand).

14. *Id.*

utes or unanimous written consents for the compensation committee (while Colligan and Robison were members) were backdated, at least as to those minutes involving stock-option grants.

Judge Alsup also noted that those categories were without prejudice to other possible requests, and ordered plaintiffs to make their books and records demand by May 14, 2007.

Indeed, on May 14, 2007, plaintiffs sent their demand to inspect books and records to CNET via certified mail. In this demand letter, plaintiffs made six requests:

1. All books and records created by, distributed to, or reviewed by CNET's Board of Directors (the "Board"), or any member or committee thereof, showing the extent to which the CNET Compensation Committee delegated (or did not delegate) to management, either stock options under CNET's 1997 Stock option Plan ("1997 Plan") and, if such delegation occurred, the extent to which the Compensation Committee was made aware of the exercise prices and dates selected.

2. All books and records establishing the specific chronology and events leading to the stock option grants alleged in the Amended Consolidated Verified Shareholder Derivative Complaint and exercise prices and grant dates associated therewith.

3. All books and records needed to determine whether John C. Colligan and/or Eric Robison received stock options that were backdated, misdated, mispriced or incorrectly dated.

4. All books and records necessary to show the extent to which any minutes or unanimous written consents for the Compensation Committee (while Colligan and Robison were members) were backdated, at least as to those minutes involving or relating to stock option grants.

5. The written report and findings of the Special Committee of the CNET Board on the Company's option granting practices and procedures.

6. All documents that CNET provided to the Securities and Exchange Commission ("SEC") in connection with the SEC's investigation into the stock option granting practices and procedures at CNET.

In this demand letter, the plaintiffs identified their purpose as "investigating possible violations of law ... in connection with the Company's granting practices" and "determining whether the Company's officers and directors are independent and/or disinterested and whether they have acted in good faith."

CNET, unmoved by Judge Alsup's request for cooperation, did not comply, and plaintiffs initiated the present action in this Court on June 14, 2007. The parties battled over discovery in a motion to compel and motion for protective order, bickered through letter submissions about a requested continuance, and barreled headlong towards trial. Finally, on November 5, 2007, the parties submitted a stipulation cancelling the trial, which was scheduled for November 14, 2007. Despite this agreement, the parties were unable to resolve the precise scope of the documents to which plaintiffs are entitled under section 220. Specifically, the parties disagree about whether plaintiffs may properly inspect books and records predating plaintiffs' ownership of stock. It is that question this opinion now resolves.

## II. LEGAL ANALYSIS

A. *Investigation of admitted stock option backdating constitutes a proper purpose under Section 220.*

■ Section 220 provides shareholders of Delaware corporations with a quali-

fied right to inspect corporate books and records.[15] In relevant part, the statute reads:

> Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from: (1) The corporation's stock ledger, a list of its stockholders, and its other books and records.... [16]

The statute is an expansion of the common law right of shareholders to protect themselves by keeping abreast of how their agents were conducting corporate affairs,[17] but it does not permit unfettered access. Before shareholders may inspect books and records, they must (1) comply with the technical requirements of section 220 and (2) demonstrate a proper purpose for seeking inspection. There is no shortage of proper purposes under Delaware law,[18] but perhaps the most common "proper purpose" is the desire to investigate potential corporate mismanagement, wrongdoing, or waste. Merely stating that one has a proper purpose, however, is necessarily insufficient. For example, a shareholder seeking a books and records inspection under section 220 in order to investigate mismanagement or wrongdoing "must present 'some evidence' to suggest a 'credible basis' from which a court can infer that mismanagement, waste or wrongdoing may have occurred." [19]

Here, as noted above, the plaintiffs have identified two purposes, but both really relate to plaintiffs' desire to bring derivatively in California a suit alleging a breach of fiduciary duty in connection with backdated options granted by CNET.[20] Defendant does not dispute this characterization. In fact, defendant relies on this character-

---

**15.** *La. Mun. Police Employees' Ret. Sys. v. Countrywide Fin. Corp.*, C.A. No. 2608–VCN, 2007 WL 2896540, at \*9 (Del.Ch. Oct. 2, 2007).

**16.** *8 Del. C.* § 220.

**17.** *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del.2002).

**18.** *See* 1 Edward P. Welch, Andrew J. Turezyn, & Robert Saunders, Folk on the Delaware General Corporation Law § 220.6.3 (supp. 2007–2) (listing well over ten examples of broad categories of proper purposes under section 220).

**19.** *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del.2006). Delaware courts have been harshly criticized for this requirement. *See, e.g.*, J. Robert Brown's *Inspection Rights under Delaware Law*, http://www.thereacetothebottom.org (Nov. 20, 2007, 6:16 a.m.) (arguing that the *Seinfeld* decision "illustrates that courts deliberately discourage the use of inspection rights by shareholders, using not the language in the statute but excessive pleading standards"). Such sensationalized criticism may make for an entertaining blog, but it is both unfair and incorrect. First, there is nothing "excessive" about requiring a petitioner to plead the elements of the statute under which he or she petitions the court. Section 220 makes inspection available only for shareholders with a "proper purpose." If a shareholder could satisfy this burden by conclusorily repeating words previously used to describe a proper purpose, the requirement would be rendered meaningless, and well settled canons of statutory construction prevent such absurd results. Second, as Justice Holland explained in *Seinfeld*, permitting a single shareholder to hound a corporation with exclusively personal requests for books and records is a waste of corporate resources that engenders no benefit for the shareholders in general. The proper purpose requirement protects against such wealth-reducing outcomes. Finally, the "credible basis" standard is "the lowest possible burden of proof" in Delaware jurisprudence, and this can hardly be characterized as an excessive pleading standard. *Seinfeld*, 909 A.2d 117 at 123.

**20.** By virtue of CNET's admission of backdating, there is sufficient evidence to support a credible basis of wrongdoing.

ization to support its chief argument: plaintiffs are not entitled to books and records from the time period before plaintiffs owned stock in CNET, because plaintiffs lack standing under 8 *Del. C.* § 327 to bring a derivative suit for any claims that accrued before they owned such stock. Thus, all parties agree that plaintiffs have a proper purpose. At issue, however, is the scope of the investigation that plaintiffs' proper purpose will permit.

B.  *A stockholder must be given sufficient access to books and records to effectively address the problem of backdating through derivative litigation.*

Section 220 does not sanction a "broad fishing expedition," [21] but "where a § 220 claim is based on alleged corporate wrongdoing, ... the stockholder should be given enough information to effectively address the problem...." [22] Generally, this Court has "wide latitude in determining the proper scope of inspection," and this Court must "tailor the inspection to the stockholder's stated purpose." [23]

Defendant argues that plaintiffs should be barred from inspecting any books and records that predate plaintiffs' ownership of CNET stock. Because plaintiffs are only seeking to bring a derivative claim, defendant argues, and because plaintiffs can only bring claims for wrongs that oc-

curred after plaintiffs purchased stock, there is no reason for plaintiffs to inspect documents before the purchase date. In so arguing, defendant relies heavily on *Polygon Global Opportunities Master Fund v. West Corp.* [24] and *West Coast Management & Capital, LLC v. Carrier Access Corp.* [25] In Polygon, Vice Chancellor Lamb refused to grant an investigation under section 220 where the shareholder, an arbitrage fund, purchased shares in the West Corporation after an announced reorganization and then sought a books and records inspection to look into potential derivative claims in connection with the proposed reorganization plan. [26] Because the fund could not possibly have standing to challenge any breach it purportedly wanted to investigate, allowing an inspection of books and records under section 220 was improper. [27] In West Coast, shareholders attempted to conduct a section 220 inspection after their federal derivative claim was dismissed for failure to adequately plead demand futility. [28] There, however, the federal judge "specifically denied the plaintiffs' request for leave to replead." [29] With this explicit ruling in hand, Vice Chancellor Lamb concluded that the shareholders were estopped from relitigating demand futility and, therefore, lacked a proper purpose under section 220. [30] Finally, defendant also cites lan-

21.  *Freund v. Lucent Techs., Inc.*, C.A. No. 18893, 2003 WL 139766, at *4 (Del.Ch. Jan. 9, 2003).

22.  *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del.2002).

23.  *Security First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del.1997).

24.  C.A. No. 2313–N, 2006 WL 2947486 (Del. Ch. Oct. 12, 2006).

25.  914 A.2d 636 (Del.Ch.2006).

26.  2006 WL 2947486, at *5.

27.  *Id.*

28.  914 A.2d at 639.

29.  *Id.*

30.  *Id.* at 646 (noting that because West Coast's "sole purpose is to use the information it seeks to replead demand futility"—an action it is precluded from doing—it lacks a proper purpose under section 220).

guage from the Supreme Court's opinion in *Saito* that indicates "if the stockholder's only purpose [in pursuing a section 220 books and records inspection] was to institute derivative litigation," one might reasonably question "whether the stockholder's purpose was reasonably related to his or her interest as a stockholder."[31]

■ However, *Polygon* and *West Coast* are distinguishable, and *Saito*, while instructive, mandates a different result than what defendant proposes. Plaintiffs here do not seek the pre–2000 books and records in order to investigate potential *new* causes of action—claims plaintiffs would admittedly have no standing to assert. Rather, plaintiffs seek access to those documents in order to plead demand futility with respect to the causes of action plaintiffs *do* have standing to bring.

■ Judge Alsup told plaintiffs to go to Delaware to find the particularized facts they needed to properly plead demand futility. There are several ways plaintiffs can attempt to accomplish this, one of which is the second prong of *Aronson v. Lewis*. To plead demand futility under the second prong of *Aronson*, a shareholder must allege particularized facts that create a reasonable doubt that the "challenged transaction was ... the product of a valid exercise of business judgment."[32] This invites an inquiry "into the substantive nature of the challenged transaction and the board's approval thereof."[33] One

potential way to show that the board was not exercising valid business judgment is to show that there was a "sustained or systematic failure of the board to exercise oversight"[34]—a violation of the board's duty of loyalty by way of bad faith.[35] To show a "sustained or systematic failure of the board to exercise oversight," the plaintiffs might reasonably need to consult documents that predate their ownership of CNET stock.

In *Polygon*, the shareholder's articulated purpose was solely to investigate potential claims—claims that the shareholder would be barred from bringing. Here, plaintiffs are seeking particularized facts to replead demand futility; they are not fishing for new claims. In *West Coast*, the federal judge overseeing the derivative action explicitly barred the shareholder from repleading demand futility. Here, Judge Alsup explicitly asked plaintiffs to do just that. Indeed, *Saito* is ultimately controlling. There, Justice Berger defined the appropriate scope of a books and records investigation as "enough information to *effectively address the problem....*"[36] Here, plaintiffs cannot effectively address the alleged problem through a derivative suit unless they can properly plead demand futility. Because *Stone v. Ritter* held that a violation of the duty of loyalty/good faith described in *Caremark* can, in theory, excuse demand,[37] and because plaintiffs might need older documents to establish a "sustained or systematic fail-

---

**31.** *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 117 (Del.2002).

**32.** 473 A.2d 805, 814 (Del.1984).

**33.** *Id.*

**34.** *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (quoting *In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del.Ch. 1996)).

**35.** Indeed, the plaintiffs here specifically stated that one of their purposes for seeking a books and records inspection under section 220 was to investigate the good faith of the CNET directors.

**36.** 806 A.2d at 115 (emphasis added).

**37.** 911 A.2d at 372–73.

ure" of oversight,[38] I must conclude that plaintiffs' request for the documents here is reasonably related to their proper purpose as shareholders of CNET.

## III. CONCLUSION

Plaintiffs should have access to books and records that predate their purchase of stock in order to allow them to explore a potential lapse in the good faith of the CNET board that would excuse demand in the California derivative suit. The outer bounds of this disclosure are defined by plaintiffs' demand letter itself; not by plaintiffs' interrogatories.[39] It is about time defendant takes Judge Alsup's advice, provides the requested documents, and gets "going, going / back, back / to Cali, Cali." [40]

IT IS SO ORDERED.

---

**38.** *See Desimone v. Barrows,* 924 A.2d 908, 940 (Del.Ch.2007) ("[I]n order to state a viable *Caremark* claim, and to predicate a substantial likelihood of director liability on it, a plaintiff must plead the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed."); *Guttman v. Jen–Hsun Huang,* 823 A.2d 492, 506 (Del.Ch.2003) (noting that a *Caremark* claim is successful "on a showing that the directors were conscious of the fact that they were not doing their jobs").

**39.** *See Kaufman v. CA, Inc.,* 905 A.2d 749, 753–54 (Del.Ch.2006) ("[R]elief under Section 220 is limited only to the inspection of books and records that are necessary and essential to the satisfaction of the stated purpose. To summarize the meaning of our cases as to this latter prong, when a books and records action is brought with the goal of evaluating a possible derivative suit, the books and records that satisfy the action are those that are required to prepare a well-pleaded complaint. Of course, this means that Section 220 is not meant as a replacement for discovery under Rule 34.").

**40.** The Notorious B.I.G., *Going Back to Cali,* on Life After Death (Bad Boy Records 1997).