**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| HIGH RIVER LIMITED PARTNERSHIP, ICAHN PARTNERS MASTER FUND LP, and ICAHN PARTNERS LP, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **C.A. No. 2019-0403-JRS** |
| OCCIDENTAL PETROLEUM CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Date Submitted: September 20, 2019
Date Decided: November 14, 2019

Stephen E. Jenkins, Esquire, Richard D. Heins, Esquire and Aaron P. Sayers, Esquire of Ashby & Geddes, Wilmington, Delaware, Attorneys for Plaintiffs.

Gregory P. Williams, Esquire, John D. Hendershot, Esquire, Kevin M. Regan, Esquire and Andrew Milam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Kevin J. Orsini, Esquire and Benjamin Gruenstein, Esquire of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

On May 9, 2019, Defendant, Occidental Petroleum Corporation (or the "Company"), entered into a merger agreement with Anadarko Petroleum Corporation. As the transaction essentially involved a merger of equals, Occidental had to fund a substantial portion of the $55 billion acquisition price with outside financing. Occidental raised approximately $10 billion through a sale of preferred stock to Berkshire Hathaway, Inc., and another $8.8 billion through a presale of Anadarko's African assets to Total S.A. ("Total").

Plaintiffs, High River Limited Partnership, Icahn Partners Master Fund LP and Icahn Partners LP (collectively "the Icahn Parties"), are all affiliates of Carl C. Icahn ("Icahn"), a prominent activist investor. They began buying Occidental stock on May 2, 2019, after Occidental's offer to buy Anadarko and its sale of preferred stock to Berkshire were announced. The Icahn Parties eventually invested upwards of $1.5 billion in Occidental stock. They are currently mounting a proxy fight to replace members of Occidental's board of directors (the "Board") with a new slate of directors they have proposed to Occidental's stockholders.

Plaintiffs sent a demand letter to Occidental on May 21, 2019 (the "Demand"), seeking to inspect books and records related to: (1) the Occidental-Anadarko merger; (2) Occidental's decision to be a buyer, not a seller, when market conditions for a sale of the Company appeared to be favorable; and (3) provisions of Occidental's governance documents detailing the threshold for calling a special meeting of the

1

stockholders. On May 28, Occidental replied that it was "considering the demand." Two days later, Plaintiffs filed this action under 8 *Del. C.* § 220 ("Section 220") seeking to inspect the same documents it had requested in its Demand.

Although they make a cursory argument about the need to investigate corporate wrongdoing or mismanagement, Plaintiffs freely admit their primary purpose for demanding to inspect books and records is to aid them in their proxy contest. They urge the Court to recognize a new, or at least expanded, rule that would allow a stockholder to inspect books and records relating to targeted, board-level business decisions that are questionable, but not actionable, when the stockholder states and then demonstrates that his purpose is to communicate with other stockholders in furtherance of a potential, *bona fide* proxy contest.

The law regarding whether a stockholder's desire to communicate with other stockholders is a proper purpose to justify inspection is, at best, murky. It may well be that, in the right case, this court might endorse a rule that would allow a stockholder to receive books and records relating to questionable, but not actionable, board-level decisions so that he can communicate with other stockholders in aid of a potential proxy contest. After carefully considering the evidence and the arguments of counsel, however, I am satisfied this is not that "right case." Accordingly, judgment will be entered for Defendant.

## I. BACKGROUND

I have drawn the facts from the parties' pre-trial stipulation, evidence admitted at trial and those matters of which the Court may take judicial notice.[1] A half-day trial was held on September 20, 2019, and oral argument followed the closing of the evidence. The trial record consists of 53 joint trial exhibits, 72 pages of trial testimony and one lodged deposition. The following facts were proven by a preponderance of the competent evidence.[2]

### A. The Parties and Relevant Non-Parties

Plaintiffs, High River, Icahn Partners Master Fund LP and Icahn Partners LP are all affiliates of Carl Icahn.[3] They collectively own approximately 26 million shares of Occidental stock with a market value of $1.16 billion.[4]

---

[1] I cite to the Joint Pre-Trial Stipulation and Order as "PTO ¶ __," the joint trial exhibits as "JX __," and the trial transcript as "Tr. __ (witness name)."

[2] *Kosinski v. GGP, Inc.*, 214 A.3d 944, 950 (Del. Ch. 2019) (confirming that a stockholder must prove by a preponderance of the evidence all of the requisite elements of a Section 220 claim, including proper purpose).

[3] JX 2 at 7.

[4] *See* Tr. 12:12–22 (Graziano).

Defendant, Occidental, is a Delaware Corporation with headquarters in Houston, Texas.[5] It is a large petroleum and chemicals corporation with extensive operations in the Permian Basin in West Texas and Eastern New Mexico.[6]

Non-party, Anadarko, was a petroleum and chemicals corporation that had extensive drilling operations in the Permian Basin.[7]

Non-party, Nicholas Graziano, is a portfolio manager at Icahn Capital, an Icahn controlled entity.[8] The Icahn Parties began investing in Occidental at Graziano's suggestion.[9] Graziano was the sole witness at trial.

Non-party, Berkshire, is a conglomerate controlled by its Chairman and CEO Warren Buffet.[10] Berkshire operates as a holding company whose primary business is making major capital investments in other companies.[11]

---

[5] PTO ¶ 1.

[6] PTO ¶ 2.

[7] PTO ¶ 4.

[8] Tr. 6:10–17 (Graziano).

[9] Tr. 11:7–13 (Graziano).

[10] *See* Berkshire Hathaway Annual Report (10-K) Feb. 25, 2019.

[11] *Id.*

Non-party, Total, is a French oil and gas producer with significant investments in Africa.[12]

Non-party, Chevron Corporation, is a "major" American oil and gas producer.[13]  In 2018, its operating revenues were $158.9 billion.[14]

## B. Occidental Acquires Anadarko

On April 12, 2019, Chevron announced it had reached an agreement to acquire Anadarko for approximately $65 per share.[15]  Prior to Chevron's bid, Anadarko's stock was trading in the mid-$40s.[16]  Most of the merger consideration was to be paid in Chevron stock.[17]  As a much larger company, Chevron was able to structure its offer with a heavy dose of its stock without triggering fears that the bid would significantly depress its stock price.[18]

---

[12] *See* Press Release, Total, *Total Closes the Acquisition of Anadarko's Shareholding in Mozambique LNG* (Sept. 30, 2019) https://www.total.com/en/media/news/press-releases/total-closes-acquisition-anadarkos-shareholding-mozambique-lng.

[13] Tr. 22:15–16 (Graziano).

[14] Chevron Annual Report (10-K) Feb. 22, 2019 at 28.

[15] PTO ¶ 9.

[16] Tr. 14:2–7 (Graziano).

[17] PTO ¶ 9.

[18] Chevron's market capitalization was approximately $200 billion immediately before the proposed merger, with the merger price being $33 billion. Y CHARTS https://ycharts.com/companies/CVX/market_cap (last visited Oct. 18, 2019).  Stock-only transactions often risk depressing the value of the acquiring company's stock, but this risk is lessened when the acquiring company is significantly larger than the target. *See* Avi

Occidental had previously made a bid for Anadarko at a higher price, but the bid was rejected.[19] On April 24, 2019, Occidental proposed to acquire Anadarko for $76 per share.[20] Anadarko stockholders would receive $38 cash and 0.6094 shares of Occidental stock for each share of Anadarko stock.[21] On May 5, Occidental revised its proposal to $59 per share cash and 0.2939 shares of Occidental stock per share of Anadarko.[22]

After Chevron did not exercise its matching rights, on May 9, Anadarko terminated the Chevron Merger Agreement and paid the $1 billion termination fee owed to Chevron under that agreement.[23] Occidental and Anadarko then entered into a Merger Agreement whereby Occidental would acquire Anadarko for a notional price of $76 per share on the terms of Occidental's May 5 offer. The final

---

Salzman, *Chevron Actually Wins by 'Losing' the Contest to Buy Anadarko Petroleum*, BARRON'S (May 9, 2019), https://www.barrons.com/articles/chevron-anadarko-occidental-mergers-51557430645; Alfred Rappaport and Mark L. Sirower, *Stock or Cash? The Trade-Offs for Buyers and Sellers in Mergers and Acquisitions*, HARV. BUS. REV. https://hbr.org/1999/11/stock-or-cash-the-trade-offs-for-buyers-and-sellers-in-mergers-and-acquisitions (last visited Oct. 18, 2019) (noting in stock transactions the selling shareholders take more risk than in cash transactions).

[19] Tr. 10:15–19 (Graziano).

[20] PTO ¶ 10.

[21] *Id.*

[22] PTO ¶ 17.

[23] PTO ¶ 19.

$38 billion deal price at closing reflected a $72.34 per share value.[24] Before Occidental's bid was made public, Occidental's market capitalization was only slightly larger than Anadarko's.[25] Because shares issued as part of the offer constituted less than 20% of Occidental's float, a vote of the Occidental stockholders was not required to approve the transaction.[26]

## C. Occidental Finances the Acquisition

As noted, a significant portion of the merger consideration was to be in cash. Accordingly, Occidental needed financing to fund the transaction. On April 30, 2019, Occidental announced it had raised $10 billion in an offering of preferred shares to Berkshire.[27] The preferred shares pay an annual cash dividend of 8% and are senior to Occidental's common stock, but junior to its debt securities.[28] Rather than paying a cash dividend, Occidental has the option to make dividend payments

---

[24] Jennifer Hiller, *Anadarko shareholders go for the cash in $38 billion Occidental buyout*, REUTERS (Aug. 8, 2019), https://www.reuters.com/article/us-anadarko-petrol-m-a-vote/anadarko-shareholders-go-for-the-cash-in-38-billion-occidental-buyout-idUSKCN1UY22M.

[25] JX 17 at 3; JX 2 at 2.

[26] JX 7 at 13; PTO ¶ 18.

[27] JX 7 at 14.

[28] JX 8 at 90; Tr. 30:9–17 (Graziano). Because the preferred shares are structured as equity, the dividends paid to Berkshire are not tax deductible, unlike interest payments on debt. Tr. 30:2–6.

in additional preferred shares at a rate of 9%.[29]  At the time the sale to Berkshire was announced, Occidental's debt was yielding between 3% and 4% and its common stock was yielding approximately 5%.[30]

Berkshire also acquired warrants to purchase 80 million common shares of Occidental stock with an exercise price of $62.50 per share.[31]  If converted, these shares would represent approximately 10% of Occidental's outstanding stock.[32] Using the Black-Scholes option pricing method, Plaintiffs value these warrants at $1.2 billion.[33]  Plaintiffs argue Berkshire fleeced Occidental because Occidental could have found much cheaper financing elsewhere had it bothered to look.[34] In response, Occidental points to evidence that very few, if any, other lenders could have promptly agreed to provide such a large block of financing with no syndication contingencies or demand risks.[35]

---

[29] Tr. 31:12–15 (Graziano).

[30] Tr. 30:9–17 (Graziano).

[31] JX 8 at 90.

[32] Tr. 30:22–24 (Graziano).

[33] Tr. 31:16–32:9 (Graziano).

[34] Tr. 32:21–35:8 (Graziano).

[35] JX 40 at 1.

Five days after the preferred stock sale, Occidental agreed to pre-sell Anadarko's Africa assets to Total for $8.8 billion.[36] The proceeds of the sale were applied to cover a part of the cash consideration for the Anadarko acquisition and to "fast-track[ ] the divestiture plan previously described by Occidental, delivering on the majority of the $10 to $15 billion of planned asset sales."[37] Plaintiffs contend the fire sale price of $8.8 billion was woefully inadequate.[38] Occidental later issued $13 billion of new debt yielding 3% as further financing for the Anadarko purchase.[39]

## D. Plaintiffs' Consent Solicitation

On June 26, 2019, Plaintiffs and other Icahn associated entities filed preliminary proxy materials. They attempted to obtain requests from the record holders of 20% of Occidental's common stock—the threshold by which they could require the Occidental Board to set a record date for a consent solicitation.[40] The Icahn Parties intend to solicit written consents to elect four directors nominated by Icahn entities, change Occidental's bylaws and effect other changes to Occidental's

---

[36] JX 42 at 1.

[37] *Id.*

[38] Tr. 55:13–58:8 (Graziano).

[39] JX 19 at 7.

[40] Tr. 39:3–13 (Graziano).

consent solicitation process.[41]  Occidental is vigorously contesting all of the Icahn Parties' proposals.[42]

### E. Procedural History

On May 21, 2019, Plaintiffs sent their Demand to Occidental seeking to inspect certain books and records related to the Anadarko merger and provisions of Occidental's governance documents.[43]  On May 28, Occidental responded that it was "considering the demand."[44]  Plaintiffs filed their Verified Complaint two days later.[45]

Plaintiffs  demand to inspect any documents: (1) provided to the Board about the Berkshire preferred stock transaction; (2) provided to the Board about the sale of Anadarko's assets to Total; (3) provided to the Board regarding the effect fluctuating oil and gas prices would have on Occidental, including projections and forecasts; (4) provided to the Board concerning any consideration given to selling Occidental's assets, or the Company as a whole; and (5) concerning whether the Board intends to comply with the stockholder proposal, adopted at Occidental's annual meeting, that

---

[41] JX 28 at 2–5, 9.

[42] JX 32.

[43] JX 2, Ex. A.

[44] JX 3 at 1

[45] JX 2.

seeks to lower the threshold to call a special meeting from 25% stockholder approval to 15%.[46]

## II. ANALYSIS

Section 220 is an "important part of the corporate governance landscape in Delaware[,]" but "it would invite mischief to open corporate management to indiscriminate fishing expeditions."[47] In order to inspect books and records under Section 220, therefore, a plaintiff must have a proper purpose.[48] In the typical case where a stockholder seeks to inspect books and records to investigate corporate wrongdoing, the stockholder must demonstrate a credible basis to suspect that mismanagement or wrongdoing has occurred before the corporation will be compelled to allow inspection.[49] When a plaintiff has demonstrated a credible basis to suspect wrongdoing, this court has allowed the plaintiff to use acquired books and

---

[46] JX 2 at 23–24. Defendants have already provided Plaintiffs with the documents in request (5), leaving only the first four as live requests. *See* JX 52–53.

[47] *Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 571 (Del. 1997). *See also Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007) (noting that Section 220 "does not permit unfettered access" to books and records).

[48] *Sec. First Corp.*, 687 A.2d at 566–67.

[49] *See Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006) ("We reaffirm the well-established law of Delaware that stockholders seeking inspection under section 220 must present some evidence to suggest a credible basis from which a court can infer that mismanagement, waste or wrongdoing may have occurred.") (quotations omitted).

11

records to mount a proxy contest.[50] But neither the parties nor the Court have found any Delaware decision where Chancery has compelled a company to allow inspection of books and records when the stockholder's only stated purpose for inspection is a desire to communicate with other stockholders in furtherance of a potential proxy contest.[51]

## A. Proper Purpose

By the time of trial, Plaintiffs had proffered two purposes in support of their inspection demand. First, they maintained that their intent to mount a proxy contest following the Anadarko acquisition, and related Berkshire preferred stock offering and Total asset sale, is a proper purpose that justifies inspection of board-level documents relating to those transactions in order to enhance the quality of their communications with fellow stockholders.[52] Recognizing this presents a novel application of Section 220, they argue in the alternative that they have established a

---

[50] *See id.* at 119–20 ("Stockholders may use information about corporate mismanagement, waste or wrongdoing in several ways. For example, they may . . . mount a proxy fight to elect new directors.") (quoting *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 117 (Del. 2002)).

[51] *See* Post-Trial Oral Arg. ("OA") 81–87, 104; Pls.' Opening Pre-Trial Br. ("OB") 37 (noting "*stare decisis* might prevent this Court from focusing on materiality [to a proxy fight] rather than mismanagement . . ."); Def.'s Answering Pre-Trial Br. ("AB") 14–18 (discussing cases suggesting a stockholder seeking to investigate management decision-making must always articulate a credible basis to infer wrongdoing).

[52] OB 34–35.

credible basis to infer corporate mismanagement or wrongdoing.[53]   I address the proffered mismanagement/wrongdoing purpose first since that purpose fits crisply within existing Section 220 jurisprudence.  Finding that purpose unsupported by the trial record, I turn to Plaintiffs' argument that their desire to communicate with stockholders regarding the Anadarko transaction (and related transactions) justifies an order compelling the Company to allow inspection of substantial transaction-related documents.

### 1. Plaintiffs Have Failed to Demonstrate a Credible Basis to Infer Mismanagement

While "credible basis" is the lowest burden of proof recognized in our law, it still requires a plaintiff to provide *some* evidence of wrongdoing.[54]   Mere disagreement with a business decision is not enough.[55]  Plaintiffs have not met that low burden here.  They have not alleged, much less proven, that the Occidental Board was conflicted, disloyal or in some way interested in the transactions at issue. They also do not allege, nor have they proven, that the Occidental Board acted in bad faith.[56]

---

[53] OB 37.

[54] *Hoeller v. Tempur Sealy Int'l, Inc.*, 2019 WL 551318, at *7 (Del. Ch. Feb. 12, 2019).

[55] *Deephaven Risk Arb. Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *8 (Del. Ch. July 13, 2005).

[56] In a letter sent after trial, Plaintiffs suggest the Occidental directors engaged in "knowing intentional breaches of fiduciary duty."  D.I. 35.  No such allegations appear in the

Instead, Plaintiffs' allegations of mismanagement appear to be nothing more than disagreements with how Occidental's directors exercised their business judgment. They think the Anadarko purchase, Berkshire preferred stock sale and Total asset sale were bad deals.[57] But disagreeing with a board's business judgment, without more, is not enough to provide a credible basis to infer mismanagement.[58] Plaintiffs' disagreements with the Board's deal making prowess do not establish a credible basis to infer mismanagement or wrongdoing.[59]

---

operative Complaint. In fact, Plaintiffs explicitly *denied* making such allegations in their pre-trial brief. OB 7. Plaintiffs' abrupt, unexplained change in position, after the case has been submitted, will not be countenanced.

[57] *See* Tr. 13:21–15:14; 21:11–29:14 (Graziano) (objecting to the terms and process of the Anadarko purchase); Tr. 29:15–37:5 (detailing problems with the Berkshire preferred financing); Tr. 37:6–38:12; 45:1–17 (describing concerns with the sale of Anadarko's Africa assets to Total);

[58] *See Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *4 (Del. Ch. July 30, 2004) ("When a business judgment forms the basis of a request for books and records, a stockholder must show a credible basis for an inference that management suffered from some self-interest or failed to exercise due care in a particular decision.").

[59] This is especially so when a company, like Occidental, has a provision in its charter per 8 *Del. C.* § 102(b)(7) exculpating directors for duty of care violations. *See Se. Pa. Trans. Auth. v. Abbvie, Inc.*, 2015 WL 1753033, at *13 (Del. Ch. Apr. 15, 2015) (holding that when a company's "Section 102(b)(7) exculpatory provision serves as a bar to stockholders recovering for certain director liability in litigation," a stockholder's inspection demand under Section 220 must "target non-exculpated corporate wrongdoing").

14

## 2. Plaintiffs' Proposed Proxy Fight Standard

Perhaps recognizing the weakness of their mismanagement argument, Plaintiffs ask this Court to recognize a new rule entitling stockholders to inspect documents under Section 220 if they can show a credible basis that the information sought would be material in the prosecution of a proxy contest.[60] According to Plaintiffs, our case law focuses on the contours of the inspection right in the context of investigating mismanagement because those are the cases where Section 220 is most frequently invoked.[61] They point to a number of additional "proper purposes" Delaware courts have identified, and urge this Court to add their proposed proxy contest rule to the list.[62]

---

[60] OB 35; OA 86.

[61] Pls.' Reply Pre-Trial Br. ("RB") 8.

[62] *See* RB 9. The *Folk* treatise provides an excellent summary of the various proper purposes a stockholder might proffer in support of an inspection demand:

> A stockholder may state a "proper purpose" when he seeks to investigate allegedly improper transactions or mismanagement; to clarify an unexplained discrepancy in the corporation's financial statements regarding assets; to investigate the possibility of an improper transfer of assets out of the corporation; to ascertain the value of his stock; to aid litigation he has instituted and to contact other stockholders regarding litigation and invite their association with him in the case; "[t]o inform fellow shareholders of one's view concerning the wisdom or fairness, from the point of view of the shareholders, of a proposed recapitalization and to encourage fellow shareholders to seek appraisal"; "to discuss corporate finances and management's inadequacies, and then, depending on the responses, determine stockholder sentiment for either a change in management or a sale pursuant to a tender offer"; to inquire into the independence, good faith, and due care of a special committee formed to consider a demand to institute

15

Plaintiffs rely on two cases to support the propriety of their proffered purpose. The first, *Tactron, Inc. v. KDI Corporation*,[63] involved an inspection demand where stockholders sought books and records that would provide logistical assistance in mounting a proxy contest, specifically:

> information relating to record dates, quorums, number of directors, amendments, procedures for the solicitation of written consents of stockholders and other provisions in connection with the solicitation of written consents or proxies for the execution of written consents from the holders of the outstanding voting securities of KDI to be used to remove at least a majority of the present members of the board of directors of KDI. . . .[64]

---

derivative litigation; to communicate with other stockholders regarding a tender offer; to communicate with other shareholders in order to effectuate changes in management policies; to investigate the stockholder's possible entitlement to oversubscription privileges in connection with a rights offering; to determine an individual's suitability to serve as a director; to obtain names and addresses of stockholders for a contemplated proxy solicitation; to inspect documents related to a "market check" on the terms of financing that may have been influenced by an interested party; to obtain particularized facts needed to adequately allege demand futility after the corporation had admitted engaging in backdating stock options; or to investigate a private corporation's "serial failure to convene annual stockholder meetings."

Edward P. Welch, Robert S. Saunders, and Jennifer C. Voss, *Folk on the Delaware General Corporation Law*, § 220.05[A] (Wolters Kluwer Law & Business, 2019 ed.) (citations omitted).

[63] 1985 WL 44694 (Del. Ch. Jan. 10, 1985).

[64] *Id.* at *1.

Then-Vice Chancellor Berger granted plaintiffs' request for documents, noting that the demand implicated considerations similar to when a stockholder seeks to inspect books and records to value stock:

> "[b]y statute, a proper purpose is one reasonably related to such person's interest as a stockholder. It seems clear that Tactron's purpose satisfies this requirement . . . . In cases where inspection is sought to value one's stock, our courts consistently have limited the extent of that inspection to those records which are essential and sufficient to accomplish the stated purpose. I see no reason why that standard should not apply here, where the demand is not related to any allegation of mismanagement.[65]

While Plaintiffs read *Tactron* as supporting their broad inspection demand, it is difficult to miss that the court there was addressing a very narrow demand for purely logistical information. The plaintiffs in *Tactron* were not seeking information to sway the votes of stockholders in a proxy contest; they were seeking information about *how to reach stockholders* to share information they already had in their possession.[66] As the *Tactron* court correctly noted, plaintiffs' request was much more like a Section 220(b)(1) request to inspect a stock list than a Section 220(b)(2) request to inspect a broader set of books and records to investigate suspected

---

[65] *Id.* (quotations and citations omitted).

[66] *Id.*

17

wrongdoing.[67] Indeed, the *Tactron* plaintiffs also sought board minutes in their demand and that request was denied.[68]

The documents Plaintiffs seek here are not merely logistical; they are, instead, the journal of the Board's decision-making with respect to all aspects of the Anadarko transaction.[69] Plaintiffs hope to use these documents to show Occidental's stockholders that the Board botched multiple decisions in connection with the Anadarko merger not just to conduct, but to *win*, a proxy contest. In this sense, it is difficult to distinguish Plaintiffs' purpose from a more typical purpose to investigate suspected mismanagement or wrongdoing. *Tactron* does not help Plaintiffs, at least not with respect to their demand to inspect books and records regarding board-level decision making.

Plaintiffs next cite then-Master LeGrow's report in *High River Ltd. Partnership v. Forest Labs., Inc.*[70] as support for their proffered purpose. *Forest*

---

[67] *Id.*

[68] *Id.* at *2.

[69] JX 2 at 23. As noted, the purely "logistical" documents in request Number 5 have already been provided to Plaintiffs.

[70] C.A. No. 7663-ML (Del. Ch. July 27, 2012) (TRANSCRIPT). *Forest Labs* involved six categories of document requests. One request related to "logistics," analogous to the *Tactron* documents, and three exclusively related to alleged mismanagement. *Id.* at 20–26, 35–36. Two other categories allegedly implicated plaintiff's purposes both to investigate mismanagement and mount a proxy contest, but the request to inspect those documents was denied. *Id.* at 26–32.

*Labs* also involved Icahn affiliates running a proxy contest.[71] As part of a proxy contest run the year before, plaintiffs had negotiated corporate governance concessions from the incumbent directors.[72] As they prepared for a new proxy contest, the plaintiffs sought documents that would reveal whether those concessions had been fulfilled.[73] They argued Section 220 was a proper tool to secure documents under the circumstances since, without documents, plaintiffs and stockholders would have no means to confirm that the Company had made governance reforms as promised.[74]

The court directed the company to produce the requested documents and, in doing so, stated, "[a] stockholder states a proper purpose by demonstrating that they are engaged or are imminently about to be engaged in a proxy contest."[75] Apparently conscious of the need to identify a limiting principle, the court looked to "the case law that animates Section 220[]" and determined that any documents requested must be "essential and sufficient" to the stated purpose of mounting the proxy contest.[76]

---

[71] *Id.* at 6–8.

[72] *Id.* at 33–35.

[73] *Id.*

[74] *Id.* at 11.

[75] *Id.* at 14.

[76] *Id.*

*Forest Labs* presented a distinct factual context, and the court there was careful to limit its ruling to the case *sub judice*.[77] In doing so, the court observed that the law in this area is unsettled and could use some clarity. I agree. But this case is not the vehicle to provide that clarity. Where, as here, the documents sought by Plaintiffs relate to a dispute with management about substantive business decisions, pleading an imminent proxy contest is not enough to earn access to broad sets of books and records relating to the details of questionable transactions, particularly when the board's decision-making is subject to the business judgment rule, and the facts of record reveal that Plaintiffs already have what they need to fulfill their stated purpose.

## B. The Documents Sought are Not "Necessary and Essential" to the Proxy Fight

When the court in *Forest Labs* decided that the plaintiffs there had articulated a proper purpose, it turned to the well-settled limiting principle embedded within Section 220 that stockholders are entitled to inspect only those documents that are

---

[77] *Id.* at 3 ("Frankly, I think this case presents some—some interesting issues . . . . And I think that the law could use some development in this area outside of transcript rulings. But the nature of proxy contests is such that the parties deserve a prompt ruling. And—and so I've—I've let that interest outweigh whatever interest I might have in saying, you know, for a larger audience what I think the law is here . . . ."). The fact the court offered its ruling from the Bench further reflects that the court intended to decide a particular dispute, not to advance a new, definitive Section 220 standard. *See, e.g.*, *In re Columbia Pipeline Gp., Inc.*, 2018 WL 4182207, at * 4 (Del. Ch. Aug. 30, 2018) (noting the generally fact-specific nature of transcript rulings) *Kalisman v. Friedman*, 2013 WL 1668205, at *7 (Del. Ch. Apr. 17, 2013) (same).

"necessary, essential and sufficient" to their stated purpose.[78] Applying that limiting principle here, I am satisfied that Plaintiffs have failed to demonstrate that the broad set of books and records they have requested are necessary and essential.

Plaintiffs' inspection demand relates to a series of closely-tied transactions that were widely publicized.[79] Occidental stockholders know the transactions well.[80] It is difficult to discern how a fishing expedition into the boardroom is necessary and essential to advance Plaintiffs' purpose to raise concerns with their fellow shareholders about the wisdom of the Board's decisions to engage in these transactions.[81] Indeed, Plaintiffs have already made their assessment of the Board's decision-making and have found it wanting.[82]

Likewise, if Plaintiffs think the Board should have considered in the past, or should consider in the future, a sale of the Company, they do not need records from

---

[78] *Forest Labs*, C.A. No. 7663-ML at 14; *BBC Acquisition Corp. v. Durr-Fillauer Med. Inc.*, 623 A.2d 85, 88 (Del. Ch. 1992).

[79] *See generally* JX 18; JX 20; JX 22; JX 24–27; JX 34–35 (news articles in prominent publications describing the transactions surrounding and including the merger).

[80] The merger was front-page news in the business press. *Id.*

[81] *See Seinfeld*, 909 A.2d at 122 (noting that fishing expeditions do not benefit the corporation).

[82] *See* Tr. 29:15–35:22 (Graziano) (comparing the terms of the Berkshire preferred sale to a later public sale of Occidental debt); Tr. 55:5–58:18 (discussing how the Plaintiffs believed the process leading to the sale to Total was faulty).

the Company to make that case.[83]  Simply stated, Plaintiffs have not demonstrated in this record how documents reflecting whether the Board has or has not considered a sale of the Company are necessary and essential to advance their proxy contest.

## III.  CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendant, Occidental.

**IT IS SO ORDERED.**

---

[83] *See* Tr.47:9–48:19; JX 4 ("Graziano Dep.") 123:24–128:7 (expressing why, in Plaintiffs' view, the Company should have been (and perhaps still should be) put up for sale).