**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| METROPOLITAN WATER RECLAMATION DISTRICT RETIREMENT FUND, LABORERS' AND RETIREMENT BOARD EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO, PARK EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO, and GARY MENDELSOHN,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>PARAMOUNT GLOBAL,<br><br>　　　　Defendant. | C.A. No. 2025-0377-CDW |

**POSTTRIAL REPORT**

Date Submitted: April 15, 2026
Date Decided: June 5, 2026

Gregory V. Varallo, Mae Oberste, Alexander J. Rigby, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Mark Lebovitch, Jeremy P. Robinson, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; David A. Knotts, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Cristelle R. Rabban, ROBBINS GELLER RUDMAN & DOWD LLP, New York, New York; Joel Fleming, David Dorfman, Lauren Godles Milgroom, Amanda Crawford, EQUITY LITIGATION GROUP LLP, Boston, Massachusetts; *Counsel for Plaintiffs Metropolitan Water Reclamation District Retirement Fund, Laborers' and Retirement Board Employees' Annuity and Benefit Fund of Chicago, Park Employees' Annuity and Benefit Fund of Chicago, and Gary Mendelsohn*

D. McKinley Measley, Alexandra M. Cumings, Anneliese Ostrom, MORRIS, NICHOLAS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jonathan K. Youngwood, Meredith Karp, SIMPSON THATCHER & BARTLETT LLP, New York, New York; *Counsel for Defendant Paramount Global*

**WRIGHT, M.**

The acquisition of Paramount Global ("Paramount") by Skydance Media LLC ("Skydance") has spun off three plenary actions by Paramount stockholders challenging the acquisition and three books-and-records cases by stockholders seeking to investigate potential wrongdoing by fiduciaries in connection with the acquisition. This is the third of the books-and-records cases.

The parties present a narrow issue to the court. The plaintiffs allege there is a credible basis to investigate if Paramount's former controller, Shari E. Redstone, exercised improper influence over the special committee's negotiation of the acquisition in order to block a sale of Paramount in favor of a sale of only National Amusements, Inc. ("NAI"), the entity through which Redstone controlled Paramount. To facilitate their investigation, the plaintiffs say it is necessary and essential for Paramount to produce informal board materials and officer-level materials regarding the departure of three members of the special committee at a sensitive time during negotiations, shortly after NAI prevented the special committee from engaging with a bidder and the special committee instead entered into an exclusivity agreement with Skydance. Paramount disagrees, arguing the plaintiffs do not have a credible basis to investigate wrongdoing and, even if they did, the informal board materials and officer-level materials sought are not necessary and essential to investigate any potential wrongdoing because the formal board materials are thorough,

complete, and accurate.  The court held a trial on a paper record to resolve the dispute.

In this final report, the court makes three main findings.  First, reaching the same conclusion as the court did in the first two books-and-records cases, the court finds the plaintiffs have demonstrated a credible basis to suspect potential wrongdoing in connection with the acquisition.  Second, the court finds informal board materials relating to the departure of the three special committee members are necessary and essential for the plaintiffs' investigatory purpose because the formal board materials paint an inaccurate picture of the three directors' departure from the special committee and Redstone's role in it, and thus fails to provide accurate details to a key event.  Third, the court finds the plaintiffs have not met their burden to show that officer-level materials are necessary and essential to fulfill their proper investigatory purpose.

For these reasons, I recommend the court grant judgment in the plaintiffs' favor on their request for informal board materials relating to the special committee members' departure, and grant judgment in Paramount's favor on the plaintiffs' request for officer-level materials relating to the special committee members' departure.

## I. BACKGROUND

The following facts are as I find them based on the parties' pleadings, pretrial submissions, 54 joint trial exhibits, and the factual stipulations in the parties' pretrial order.[1]

This action stems from a now-completed merger between defendant Paramount[2] and Skydance ("Merger").[3] Paramount and Skydance announced the Merger on July 7, 2024, which closed on August 7, 2025.[4] Plaintiffs each served demands to inspect Paramount's books and records related to the Merger process.[5]

### A. The Key Players

Plaintiffs are beneficial owners of Paramount Class B common stock.[6] Paramount is a Delaware corporation headquartered in New York City.[7] Paramount owns a collection of well-known media and entertainment assets,

---

[1] Exhibits are referred to according to the numbers provided on the parties' joint exhibit list (Dkt. 32 Ex. A) and are cited as "JX __," unless otherwise defined.

[2] Following the merger at the core of this dispute, Paramount is now known as Paramount, a Skydance Corporation. Def.'s Answering Pre-Trial Br. 4, Dkt. 23 ("Def.'s Answering Br.").

[3] Pre-Trial Stipulation and Order ¶ 4, Dkt. 33 ("Pretrial Order"). For more background on the Merger, see *State of Rhode Island Off. of the Gen. Treasurer v. Paramount Glob.*, 331 A.3d 179 (Del. Ch. 2025) ("*Rhode Island I*"), and *Gabelli Value 25 Fund, Inc. v. Paramount Glob.*, C.A. No. 2024-1353-SEM (Del. Ch. Apr. 8, 2025) (TRANSCRIPT) ("*Gabelli*" and cited as "*Gabelli* Tr.").

[4] Pretrial Order ¶ 11; JX 33.

[5] *See* Pretrial Order ¶ 5; JX 37, 39–40, 42 (together, "Demands").

[6] Pretrial Order ¶ 3.

[7] *Id.* ¶ 4.

including Paramount Pictures, CBS, Nickelodeon, Comedy Central, BET, Paramount+, and Pluto TV, along with an extensive library of television shows, films, and other intellectual property.[8]  Before the Merger, Paramount was publicly traded on the NASDAQ stock exchange.[9]  Paramount had two classes of stock: Class A common stock and Class B common stock.  Class A common stock carried voting rights; Class B common stock did not.[10]

Redstone was the controller of NAI and a former director of Paramount.[11]  NAI, in turn, held 77.4% of Paramount's voting Class A stock and was Paramount's controlling stockholder during the events giving rise to this dispute.[12]  Redstone thus indirectly controlled Paramount through NAI.[13]  In 2022, NAI amended Paramount's certificate of incorporation to codify additional governance and control rights for itself.[14]  The amendments barred Paramount, without the consent of the majority of Class A Common Stockholders, from entering into any transaction for:

> Any sale, issuance, transfer, redemption, lien, encumbrance, or other disposition (including,

[8] *See* JX 36 at 95.

[9] Pretrial Order ¶ 4.

[10] JX 46 at 2–3 ("Info. Statement").

[11] JX 23 at 18. Pl.'s Opening Pre-Trial Br. 6, Dkt. 19 ("Pl.'s Opening Br.").

[12] JX 6 at 1; *see* Info. Statement 3.

[13] JX 6 at 1–3; Info. Statement 3.

[14] *See* Am. and Restated Certificate of Incorporation of Paramount Global, JX 7 ("Paramount Certificate").

without limitation, by way of recapitalization, reclassification, dividend, distribution, merger, consolidation or otherwise) of (A) any shares or capital stock or ownership interest of Paramount Pictures Corporation ("Paramount") or of any direct or indirect subsidiary of the Corporation involved with or supporting, in either case, in a material respect, the Corporation's filmed entertainment business or any other business of Paramount (Paramount and each such subsidiary, a "Paramount Entity"), or (B) any options, warrants, convertible securities or other rights to purchase or acquire or encumber any shares of such capital stock or ownership interest of any Paramount Entity, in any case to a party that is not the Company.[15]

This addition to the Paramount Certificate gave Redstone, through her control of NAI, the ability to unilaterally prevent any merger or sale.[16]

## B. NAI Forms Paramount

On December 4, 2019, Redstone's father, Sumner Redstone, created Paramount by consolidating two corporations under NAI's control: CBS Corporation and Viacom, Inc.[17] Sumner Redstone passed away on August 11, 2020, making Redstone NAI and Paramount's controller.[18]

---

[15] Paramount Certificate, art. IX.

[16] *See* Paramount Certificate; JX 43 at 3.

[17] *See In re CBS Corp. S'holder Class Action and Deriv. Litig.*, 2021 WL 268779 (Del. Ch. Jan. 27, 2021) (resolving litigation arising from the 2019 CBS-Viacom merger). The court takes judicial notice of the findings of fact in *CBS Corp.* D.R.E. 202(b).

[18] JX 6 at 1.

The newly formed Paramount did not meet Redstone and investor's high expectations.[19] Paramount suffered a significant reduction in its stock price and was sustaining multi-million-dollar operating losses on its streaming platform through 2023.[20] As a result, Standard & Poor's lowered Paramount's credit rating to "BBB-" on March 29, 2023.[21] Around this time, Redstone began seriously exploring opportunities to offload the company.[22]

## C. After Exploring Various Restructuring and Capital Raising Options, Redstone Commits to Selling Paramount

In July, media outlets reported NAI was in talks with its creditors to renegotiate some of its outstanding debt.[23] On September 7, NAI closed a financing transaction with BDT Columbia for $25 million to address its cashflow shortfalls.[24] On October 12, Paramount's board convened to discuss its options given Paramount's internal financial forecasts and to explore "various strategic alternatives," such as asset sales or a merger, that could address the corporation's liquidity issues.[25] Shortly after this meeting, outlets

---

[19] *See* JX 8 at 1–2; JX 9; JX 24 at 2–3. After trial, Paramount withdrew its hearsay objection to all exhibits other than JX 51. *See* Dkt. 49 ¶ 1.

[20] JX 9 at 2.

[21] *See* Info. Statement 3.

[22] *See* JX 9 at 2; JX 24 at 3.

[23] Info. Statement 4.

[24] *Id.*

[25] *Id.*

began reporting NAI was open to a merger or selling Paramount and potentially interested in a sale involving itself instead of Paramount.[26]

On December 7, news outlets reported NAI and Skydance were in talks regarding a potential acquisition of NAI.[27] On December 8, NAI's attorneys notified Paramount's attorneys NAI was "engaged in confidential discussions with multiple parties . . . regarding a potential change in control" of NAI "that would involve the indirect sale of NAI's ownership interest in Paramount[.]"[28]

In response, Paramount's management began taking steps to prepare for a potential acquisition or sale.[29] By the next week, media outlets began reporting Paramount was "for sale."[30] In late December, Paramount entered talks with Warner Bros. Discovery and another company about potential transactions involving its assets.[31] The *Wall Street Journal* also reported NAI and Redstone had entertained proposals from Netflix, Apple, and Comcast as well.[32] At that time, Skydance and its affiliates submitted a proposal to NAI

---

[26] *Id.*

[27] *Id.*; *see also* JX 9 at 5.

[28] Info. Statement 4.

[29] *See id.*

[30] *Id.*

[31] JX 9 at 4.

[32] JX 24 at 2–3.

whereby Skydance would acquire a controlling interest in NAI subject to a "strategic combination of Skydance and Paramount."[33]

On December 28, NAI's attorneys, Ropes & Gray LLP ("R&G"), notified Paramount's counsel, Simpson Thacher & Bartlett LLP, that NAI had received Skydance's acquisition proposal.[34] R&G informed Paramount that Skydance's proposed acquisition would be conditioned on a separate transaction where Paramount would combine with Skydance, and that Skydance would negotiate directly with Paramount regarding the correlated merger.[35] The correspondence concluded with a recommendation that Paramount "refer consideration of [Skydance's] proposed transaction . . . to a committee of independent and disinterested directors[,]" and that "Paramount had the full support of NAI and Ms. Redstone in determining whether to accept or reject a transaction with Skydance."[36] Soon after, the independent members of Paramount's board contacted the law firm Cravath, Swaine & Moore LLP ("Cravath") to discuss retaining it as counsel for a soon-to-be-formed special committee.[37]

---

[33] Info. Statement 5.

[34] *Id.*

[35] *Id.*

[36] JX 45 at 5.

[37] *Id.*

- 8 -

### D. Paramount Forms a Special Committee

On January 2, 2024, Paramount's board voted to form a special committee of the directors on Paramount's board that Paramount deemed were independent ("Special Committee").[38] The Special Committee originally consisted of directors Barbara M. Byrne, Linda M. Griego, Judith A. McHale, Dawn Ostroff, Charles E. Phillips, Jr., Susan Schuman, Nicole Seligman, and Frederick O. Terrell.[39] Immediately after its formation, the Special Committee held its first meeting and retained Cravath as its legal counsel.[40]

On January 3, Cravath and R&G attorneys held a call to discuss a potential three-party transaction between Paramount, NAI, and Skydance.[41] During this call R&G informed Cravath that NAI would "support Paramount's independent decision-making."[42] The next day, the Special Committee met

---

[38] Info. Statement 5. As described by Paramount, "[e]ach member of the Special Committee (a) is not affiliated with NAI, (b) is not a member of Paramount management, (c) does not have an interest in the proposed transaction[,] and (d) otherwise does not have any interest or relationship that would interfere with the exercise of his or her independent judgment in carrying out the responsibilities of, or that is likely to have an adverse impact on his or her ability to fulfill his or her obligations as a member of, the Special Committee in evaluating any potential transaction." *Id.* 10.

[39] *Id.* 5.

[40] *Id.*

[41] *Id.*

[42] *Id.* 5–6.

again to discuss Cravath's conversation with R&G and opted to retain an independent financial advisor.[43]

On January 8, Skydance submitted a non-binding indication of interest to combine Skydance with Paramount and cause certain Skydance affiliates to make additional cash investment in Paramount, in tandem with Skydance acquiring a controlling interest in NAI.[44] At a Special Committee meeting the next day, Paramount's CEO suggested potential alternative counterparties to a transaction, including a private equity firm and an industry peer.[45]

The process heated up after news outlets reported that NAI had launched a formal auction to court potential acquirers and that Skydance was partnering with other investors for an all-cash acquisition of NAI.[46] From this point until early March, the Special Committee engaged with several interested parties in concert with Cravath and the Special Committee's independent financial advisor, in addition to continuing discussions with Skydance.[47]

---

[43] *Id.* 6.

[44] *Id.*

[45] *Id.* 6–7. The identities of these counterparties were not publicly disclosed. *See id.* (anonymizing the suggested counterparties).

[46] *Id.* 7.

[47] *See id.* 7–15; JX 10.

On March 6, the private equity firm Apollo Global Management offered $11 billion to purchase just Paramount Studios.[48] On March 11, the Special Committee considered Apollo's offer.[49] At the meeting, the Special Committee agreed Apollo's offer "warranted further consideration and discussion" but the Special Committee also noted any such transaction would need to be approved by NAI and, ultimately, Redstone due to Article IX of the Paramount Certificate.[50] The Special Committee's financial advisor also informed it that "NAI was unlikely to favor a private equity firm such as Apollo" over a strategic counterparty due to Redstone's preference not to break apart Paramount.[51] The minutes noted several directors "expressed skepticism" NAI would support a transaction with Apollo, but thought the "viability" of selling Paramount Pictures as a standalone company should be explored.[52]

On March 12, the Special Committee met again and revived discussions on Apollo's proposal.[53] The Special Committee's advisors informed it "a sale of Paramount Pictures would require" NAI's approval, and advised "it would

---

[48] *See* Info. Statement 15; JX 10; JX 11 at 4–8. The Information Statement defines "Paramount Studios" as "Paramount Pictures and certain of Paramount's other film and television studios (excluding CBS Studios and Paramount's other primary television studios)." Info. Statement 15.

[49] *See* JX 11 at 2.

[50] *Id.*; Info. Statement 15.

[51] JX 11 at 2; Info. Statement 15.

[52] JX 11 at 2–3; Info. Statement 15.

[53] JX 12 at 1–2; Info. Statement 15.

- 11 -

be in the [Special] Committee's interest to coordinate with NAI" given its ultimate power to approve or veto any contemplated transaction.[54] The Special Committee then deliberated on Apollo's proposal, noting it did not believe Redstone would support a standalone sale of Paramount Pictures.[55] The Special Committee ultimately determined that, despite Redstone's preferences, it would continue exploring the "sale of key assets" and the impact such a sale would have on other bids, unless NAI informed it in writing that NAI would not support the sale of such key assets.[56]

The next day, Skydance provided Cravath and the Special Committee's financial advisor a revised transaction proposal[57] which the Special Committee discussed at its March 14 meeting.[58] The Special Committee rejected Skydance's proposal and instructed its advisors to inform Skydance it would not agree to a transaction where "existing Skydance investors (or their affiliates) would own a majority of the post-transaction" company unless Skydance improved other terms to increase value for Paramount's public stockholders.[59]

---

[54] JX 12 at 2; Info. Statement 15 (referring to Paramount Studios as opposed to Paramount Pictures).

[55] *See* JX 12 at 2; Info. Statement 15.

[56] Info. Statement 15.

[57] *Id.* 15–16.

[58] *Id.* 16.

[59] *Id.*

## E. Four Special Committee Members Announce Their Departures as the Bidding Heats Up

On March 19, the Special Committee reconvened to continue its work.[60] At the meeting, Cravath informed the Special Committee that Special Committee members Ostroff, Seligman, and Terrell and director Rob Klieger would not be standing for re-election at Paramount's annual meeting in June.[61] Following this announcement, the Special Committee continued to meet and evaluate proposals from interested parties and negotiate with Skydance, among other bidders.[62]

On March 24, R&G informed Cravath NAI would not support a standalone sale of Paramount Pictures to "any potential buyer" even at a price doubling Apollo's initial $11 billion bid.[63] That same day the Special Committee met with Skydance's CEO and its financial backers to evaluate the financial outlook of a combined entity.[64]

On March 31, Apollo offered to purchase all of Paramount for $27 billion.[65] Despite the larger offer, however, Apollo's revised proposal did not

---

[60] *See* JX 13; JX 23 at 3.

[61] *See* JX 13; Jessica Toonkel, *Four Paramount Directors to Step Down as Company Discusses Skydance Merger*, WALL ST. J., Apr. 10, 2024, JX 21 ("*Wall Street Journal* Article" and cited as "WSJ Article").

[62] *See* Info. Statement 16–18.

[63] *Id.* 18.

[64] *Id.*

[65] *Id.* 19–20.

include other proposed terms for the transaction, "including details about how the acquisition would be financed" and allocating consideration between Paramount's Class A and Class B stockholders.[66] The Special Committee convened on April 1 to discuss Apollo's new proposal, particularly in light of Skydance's request to sign an exclusivity agreement for the merger negotiations.[67] Following the Special Committee meeting, Cravath contacted R&G to request NAI's opinion on Apollo's new bid.[68] R&G informed Cravath that NAI viewed Apollo's proposal as "unactionable" and that pursuing it "did not warrant the risk of Skydance walking away[.]"[69]

On April 3, the Special Committee met again in response to an updated proposal from Apollo that "clarified certain of the proposed terms," including that the purchase price would be paid in cash at closing and that Apollo had the capital to fund 100% of the proposed transaction.[70] The Special Committee again expressed doubts about the viability of Apollo's proposal and, after considering the timing, opted to continue negotiating exclusively with Skydance.[71]

---

[66] *Id.* 20–21.

[67] *Id.* 21.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.* 21–22.

On April 4, Ostroff and Seligman resigned from the board and Special Committee, purportedly "in anticipation of not standing for re-election at the 2024 Annual Meeting of Stockholders[.]"[72] The board's Nominating and Governance Committee convened on April 8 and approved a slate of directors for the 2024 nomination process.[73] The committee did not nominate anyone to fill the two former and two resigning directors' seats, which would reduce the size of Paramount's board by four directors, from eleven to seven.

On April 10, the *Wall Street Journal* reported Ostroff, Seligman, Terrell, and Klieger would step down from Paramount's board.[74] The article also claimed one of the departing directors "expressed concerns about the potential Skydance deal[.]"[75] That same day, Paramount's board approved the reduced slate of director nominees for election at the annual meeting that did not include Ostroff, Seligman, Terrell, or Klieger.[76]

## F.    The Special Committee Approves Skydance's Proposal

On April 12, the Special Committee met to discuss the proposed transaction with Skydance in more detail.[77] That same day, Skydance's counsel

---

[72] *Id.* 22.  This reduced the size of the Special Committee from eight directors to six. *Id.*

[73] JX 19–20.

[74] *See* WSJ Article 1–2; Info. Statement 23

[75] WSJ Article 2.

[76] JX 22; *see also* JX 23.

[77] Info. Statement 22–23.

sent Cravath an initial draft for the merger agreement.[78]  The Special Committee continued to engage with Skydance on the proposed transaction, meeting eight more times in April,[79] and twelve times in May.[80]

On June 4, Paramount held its annual meeting.[81]  Ostroff, Seligman, Terrell, and Klieger did not stand for re-election.[82]  Terrell stepped down from the board and Special Committee on this date as his term ended.[83]

On June 8, the now-downsized Special Committee convened again for an update on the negotiations with Skydance and to discuss next steps.[84]  The meeting minutes indicate discussions involving the transaction consideration, Skydance's proposed differential consideration for Class A and Class B common stockholders, and the resulting governance changes to the surviving entity.[85]  The Special Committee met over a dozen more times to finalize the transaction details with Skydance.[86]

---

[78] *Id.* 24.

[79] *See id.* 22–27.

[80] *Id.* 27–34.

[81] *See* JX 23 at 3.

[82] *See* JX 23 at 18 (previous board), 31–34 (board members standing for election); Info. Statement 36.

[83] Info. Statement 36.

[84] JX 29; Info. Statement 38.

[85] JX 29 at 1–2.

[86] *See* Info. Statement 38–44.

On July 7, the Special Committee unanimously approved the transaction terms and recommended the full board approve the Merger and vote to submit the proposal to the stockholders for approval.[87] Paramount's board met that same day and unanimously approved the Merger, in addition to recommending that Paramount's stockholders vote to approve it as well.[88] That day, Paramount and Skydance publicly announced the Merger and summarized its key terms in a press release.[89]

The Merger terms also gave Paramount a "go-shop" period so the Special Committee could consider alternative transaction proposals.[90] The Special Committee instructed its financial advisor to contact potential counterparties to gauge their interest in submitting competing proposals to Skydance's.[91] After contacting 58 potential parties, only seven expressed interest in a potential transaction.[92] The Special Committee engaged these parties in discussions but the other parties ultimately withdrew their proposals.[93]

---

[87] *Id.* 44.

[88] *Id.* 45.

[89] JX 33.

[90] Info. Statement 45.

[91] *Id.*

[92] *Id.*

[93] *Id.* 45–49.

On August 26, Cravath notified Skydance the go-shop period had expired, and the Special Committee publicly announced the same.[94] On November 4, Paramount filed a preliminary information statement/prospectus regarding the Merger with the Securities and Exchange Commission.[95]

## G. Plaintiffs Serve Their Demands and Paramount Produces Some Records

By letters dated November 26, 2024 and January 22, January 27, and February 4, 2025, Plaintiffs served their Demands.[96] The Demands stated Plaintiffs' purpose was to investigate potential misconduct, wrongdoing, or breaches of fiduciary duty arising from the announced Merger.[97] Paramount responded to the first demand on December 11, 2024,[98] the second and third on February 5, 2025,[99] and the fourth on February 11.[100] In its responses, Paramount partially rejected the Demands, but offered to meet and confer about the scope and terms of production.[101] The parties executed a confidentiality

---

[94] *Id.* 49.

[95] *See* JX 36.

[96] Pretrial Order ¶ 5; JX 37; JX 39; JX 40; JX 42.

[97] JX 37; JX 39; JX 40; JX 42.

[98] JX 38.

[99] JX 43; JX 44.

[100] JX 45. *See also* Pretrial Order ¶ 6.

[101] JX 38; JX 43; JX 44; JX 45.

agreement and Paramount produced responsive records to Plaintiffs through July.[102]

On July 29, Paramount certified its production in response to the Demands was complete.[103]  By letter dated August 5, Plaintiffs asked Paramount to confirm in writing it had produced all responsive formal board materials and whether Paramount would produce informal board or officer-level materials related to the departures of Special Committee members Seligman, Ostroff, and Terrell ("Director Departures").[104]  The Merger closed two days later.[105]

On September 15, Paramount responded to Plaintiffs' August 5 letter.[106] In its response, Paramount represented it had already produced all responsive formal board materials and declined to produce any informal or officer-level materials relating to the Director Departures.[107]  Paramount offered to reproduce one document with fewer redactions, among documents related to other subjects.[108]

---

[102] *See* Pretrial Order ¶ 9.

[103] Pretrial Order ¶ 9.

[104] Pretrial Order ¶ 10; JX 50 at 3.

[105] Pretrial Order ¶ 11.

[106] Pretrial Order ¶ 12; JX 52.

[107] JX 52 at 4; Pretrial Order ¶ 12.

[108] JX 52; Pretrial Order ¶ 12.

After Paramount produced the additional records, the parties met and conferred again.[109] The parties narrowed their dispute to one category of documents: those related to the Director Departures.[110]

## II. PROCEDURAL POSTURE

On April 8, 2025, Plaintiffs initiated this inspection action to maintain their standing in case the Merger closed before the dispute was resolved.[111] On April 21, the court entered a stipulated order staying these proceedings while the parties attempted to resolve their dispute.[112] On December 16, the parties asked the court to lift the stay and enter a joint proposed case schedule.[113] The court granted the proposed case scheduling order on December 22.[114]

---

[109] Pretrial Order ¶ 13; *see* JX 53.

[110] *See* Pretrial Order ¶ 13 ("The parties were able to narrow their disputes, but "remain[ed] at an impasse as to one category of documents sought by Plaintiffs," *i.e.*, Request No. 2."). Originally, this information request would have included the departure of director Bakish, because he was identified along with Ostroff, Seligman, and Terrell in Stockholders' Request No. 2. *See, e.g.*, JX 42 at 46. But Plaintiffs' pretrial briefs make it clear that the dispute is now just over the departures of Ostroff, Seligman, and Terrell. *See, e.g.*, Pls.' Opening Pre-Trial Br. 38, Dkt. 19 ("Pls.' Opening Br.") ("The Court should order [Paramount] to produce informal materials— including emails and text messages—concerning the resignations (or terminations) of the Special Committee members."); Pls.' Reply Pre-Trial Br. 31, Dkt. 26 ("Pls.' Reply Br.") (stating same); Pls.' Post-Trial Suppl. Submission 9, Dkt. 50 ("Pls.' Suppl. Br.") (stating same but substituting "the departures" in place of "the resignations (or terminations)").

[111] *See* Pls.' Opening Pre-Trial Br. 21; *but see* Pretrial Order ¶¶ 7–8 ("After filing . . . the parties agreed to attempt to resolve or narrow Plaintiffs' claims. To that end, the parties stipulated to a stay of proceedings . . . .").

[112] Dkt. 7.

[113] Dkts. 10–12.

[114] Dkt. 14.

- 20 -

On January 5, 2026, Paramount answered the complaint.[115] On January 13, Plaintiffs filed their pretrial opening brief.[116] On February 13, Paramount submitted its answering brief.[117] On February 27, Plaintiffs submitted their reply brief.[118]

On March 13, the court held a half-day trial on the matter.[119] On March 24, the court sent the parties a letter stating it believed its decision should await and consider the Supreme Court's then-pending decision in *Paramount Global v. State of Rhode Island Office of the General Treasurer, ex rel. the Employees' Retirement System of Rhode Island* ("*Rhode Island II*").[120] On March 26, the Supreme Court decided *Rhode Island II*.[121] The court asked the parties for supplemental briefing on three questions in response to the Supreme Court's decision in *Rhode Island II*.[122] The parties submitted their supplemental briefs on April 15 and the court considers the matter submitted for decision on that date.[123]

---

[115] Dkt. 18.

[116] Dkts. 19–20.

[117] Dkt. 23.

[118] Dkt. 26.

[119] Dkt. 38.

[120] Dkt. 44.

[121] *See* 2026 WL 820647 (Del. Mar. 25, 2026).

[122] Dkt. 46.

[123] Dkts. 50–51.

## III.  ANALYSIS

"Section 220 of the Delaware General Corporation Law provides a 'qualified' right for stockholders to inspect corporate books and records." *Scarantino v. Trade Desk, Inc.*, 2025 WL 3496644, at *3 (Del. Ch. Dec. 5, 2025) (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006)).  "Section 220 allows '[a]ny stockholder' of a Delaware corporation (and members of nonstock corporations), 'upon written demand under oath stating the purpose thereof,' to inspect the company's 'stock ledger,' stockholder list, and 'books and records' 'for any proper purpose.'" *Barkan v. Exabeam, Inc.*, 2025 WL 1088821, at *5 (Del. Ch. Apr. 11, 2025) (quoting 8 *Del. C.* §§ 220(a)–(b) (2010)).[124]  "There is no shortage of proper purposes under Delaware law[.]" *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007) (citation omitted).  "Once a proper purpose is shown, Section 220 does not restrict how stockholders may ultimately use the information. They may 'seek an audience with the board to discuss proposed reforms,' 'prepare a stockholder resolution for the next annual meeting,' 'mount a proxy fight to elect new directors,' or sue[,]" among other things. *Barkan*, 2025 WL

---

[124] Section 220 was amended in March 2025.  *See* 85 *Del. Laws* ch. 6.  Because the Demands were served on Paramount before February 17, 2025, this action is governed by the version of Section 220 that was in effect until March 25, 2025.  *See id.* § 3 ("Sections 1 and 2 of this Act do not apply to or affect . . . any demand to inspect books and records made, on or before February 17, 2025.").  Citations in this report to Section 220 refer to the legacy statute.

1088821, at \*5 (quoting *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 117 (Del. 2002)).

Books and records inspections under Section 220 are not tantamount to comprehensive discovery. *See KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 751 (Del. 2019) ("*Palantir*") (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 570 (Del. 1997)). A stockholder's inspection right is limited to the books and records that are "essential and sufficient to the stockholder's stated purpose.'" *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1034 (Del. 1996). "That limitation reflects a 'proper balance between the rights of shareholders to obtain information' and 'the rights of directors to manage the business of the corporation without undue interference from stockholders.'" *Barkan*, 2025 WL 1088821, at \*5 (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006)).

The parties have narrowed their dispute to two categories of records in the Demands: (1) Informal Board Materials and (2) Officer-Level Materials concerning the Director Departures.[125] Plaintiffs seek these records to investigate possible breaches of fiduciary duties and corporate wrongdoing.[126]

---

[125] *See supra* note 110. The terms "Informal Board Materials" and "Officer-Level Materials" are defined in the Demands. *See* JX 37 at 50–51 nn. 45–46; JX 39 at 48–49 nn. 45–46; JX 40 at 48–49 nn. 45–46; JX 42 at 48–49 nn. 45–46.

[126] JX 42 at 46.

- 23 -

Paramount does not contest Plaintiffs' stockholder statuses, the Demands' adherence to Section 220's form and manner requirements, or the propriety of Plaintiffs' stated purpose for inspection.[127]  Instead, Paramount maintains Plaintiffs do not have a credible basis to suspect wrongdoing, so their investigation purpose is improper.[128]  But even if Plaintiffs do have a proper purpose, Paramount contends the remaining documents in dispute are not necessary and essential to Plaintiffs' investigatory purpose.[129]  Plaintiffs counter they have a credible basis to suspect wrongdoing, so their stated purpose is proper, and the circumstances surrounding the Director Departures necessitate inspecting Informal Board Materials and Officer-Level Materials discussing those events.[130]  I agree Plaintiffs have a credible basis to suspect wrongdoing or mismanagement.  I start my analysis by addressing Paramount's objection to the court's consideration of the *New York Times* article titled *Why Did Shari Redstone Do It?*,[131] then I discuss each argument Paramount proffers to deny Plaintiffs' inspection request, before concluding with the proper scope of production.

---

[127] *See* Pretrial Order ¶¶ 3, 18–19; Def.'s Answering Br. 16–26; Def.'s Suppl. Post-Trial Br. 1–2, Dkt. 51 ("Def.'s Suppl. Br.").

[128] Def.'s Answering Br. at 10, 16–26; *see* Pretrial Order ¶¶ 18–19.

[129] Def.'s Answering Br. at 26–36; *see* Pretrial Order ¶ 20.

[130] Pls.' Opening Br. at 24–38; *see* Pretrial Order ¶ 16.

[131] James B. Stewart, *Why Did Shari Redstone Do It?*, N.Y. TIMES, Aug. 19, 2025, JX 51 ("*New York Times* Article" and cited as "NYT Article").

## A. The Court May Consider the *New York Times* Article to Resolve this Inspection Action

The parties dispute whether the court should consider the *New York Times* Article as post-demand and admissible hearsay evidence to support Plaintiffs' credible basis inquiry under the holding in *Rhode Island II*.[132] "The general rule is that when a stockholder seeks relief under § 220, [they] will be limited to evidence identified in the demand and the information available to the stockholder when the demand was made. But under exceptional circumstances, the Court of Chancery may, in the exercise of its sound discretion, consider post-demand evidence that is material to the court's credible basis inquiry and not prejudicial to the corporation." *Rhode Island II*, 2026 WL 820647, at *9. This case is one such exceptional circumstance.

The *New York Times* Article is material because it directly addresses the central issue raised here—why Special Committee members Seligman, Ostroff, and Terrell left the board. Considering the *New York Times* Article is not unduly prejudicial to Paramount, as it appears to necessary to ensure a complete and accurate record, given the article's seeming inconsistency with Paramount's argument at trial that "[n]o one was removed from the board. It was a decision not to re-run. There is no dispute about that."[133]

---

[132] Pls.' Suppl Br.; Def.'s Suppl. Br.

[133] Tr. of Mar. 11, 2026 Trial at 34, Dkt. 55 ("Trial Tr.").

Paramount objects to the *New York Times* Article because it contends the article is unreliable.[134] It argues that because the *New York Times* Article does not identify the referenced "many other participants" or attribute specific reported information to these sources, the *New York Times* Article is too vague to be reliable hearsay evidence.[135] Paramount concludes the court should not consider the information therein because the Supreme Court "caution[ed] against the use of such vague hearsay" in *Rhode Island II*.[136]

I conclude the *New York Times* Article is sufficiently reliable. *See Rhode Island II*, 2026 WL 820647, at *11. It was deeply reported.[137] The newspaper and the author have received many awards and have excellent reputations.[138] There are no indicia of unreliability, and the article's discussion of dissension within the board is corroborated by other news reports.[139] Further, the use of anonymous sources in news reporting is routine and unremarkable. *See Rhode*

---

[134] Def.'s Suppl. Br. 3–5.

[135] *See id.* 5.

[136] *Id.* Defendant makes this assertion without a citation. *See id.*

[137] *See* NYT Article 4 (noting "a series of interviews [with Redstone] . . . over the past year in person and via video calls" and interviews "with many other participants before and after the deal closed.").

[138] *See Awards & Recognition*, N.Y. TIMES, https://www.nytco.com/awards/ (149 Pulitzer Prizes) (last visited June 5, 2026); *James B. Stewart*, N.Y. TIMES, https://www.nytimes.com/by/james-b-stewart (noting Stewart holds "a Pulitzer Prize, a George Polk award, and numerous Loeb awards").

[139] *Compare* NYT Article, *with* WSJ Article, *and* Littleton et al., *What Went Wrong: Inside Paramount's Failed Merger Talks and the Battle to Salvage the Company*, VARIETY, June 19, 2024, JX 31.

*Island I,* 331 A.3d at 198–201. And it is no stretch to infer the *New York Times* Article's reporting on the Director Departures was probably based on information from people who had direct knowledge—Redstone and other Paramount directors.[140] I find I may properly consider the *New York Times* Article in this Report, and I will give it the weight and credibility it is due in my analysis.

## B. Plaintiffs Have a Credible Basis to Suspect Wrongdoing

"A stockholder's desire to investigate wrongdoing is a proper purpose. But to avoid 'indiscriminate fishing expedition[s],' a bare allegation of possible waste, mismanagement, or breach of fiduciary duty, without more, will not entitle a stockholder to a Section 220 inspection." *Rhode Island* at 188 (citing and quoting *Seinfeld*, 909 A.2d at 121). "[A] stockholder must present some evidence to establish a credible basis of mismanagement or wrongdoing warranting further investigation." *Roberta Ann K.W. Wong Leung Revocable Tr. U/A Dated 03/09/2018 v. Amazon.com, Inc.*, 345 A.3d 965, 975 (Del. 2025) ("*Amazon I*") (citing *Seinfeld*, 909 A.2d at 122). The credible basis "standard does not require stockholders to show actual waste or mismanagement." *NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys.*, 282 A.3d 1, 25 (Del. 2022) (citation omitted). Instead, stockholders "need only show, by a

---

[140] *See* NYT Article 9 (disclosing the identity of certain bidders that are anonymized in other publicly available sources). *Contrast id.*, *with* Info. Statement at Background of the Transactions (referring to bidders as "Party A," "Party B," etc.).

preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation—a showing that 'may ultimately fall well short of demonstrating that anything wrong occurred.'" *Amazon I* at 978 (quoting *Seinfeld*, 909 A.2d at 123).

"Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quotation omitted). Further "[t]he 'credible basis' standard is 'the lowest possible burden of proof.'" *Rhode Island I*, 311 A.3d at 191 (quoting *Seinfeld*, 909 A.2d at 123). A plaintiff may meet it by making "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing." *Seinfeld*, 909 A.2d at 123. Here, Plaintiffs need to present sufficient evidence that it is more likely than not a credible basis exists from which the court can infer wrongdoing might have occurred in the period covered by the Demands.

Plaintiffs say there is a credible basis to infer wrongdoing because the Merger process involved "conflicts of interest"—specifically, that Redstone received three non-ratable benefits that were not shared with other stockholders—and the timing of the Director Departures "support a reasonable

- 28 -

inference that they were connected to" the Merger process, which warrants additional investigation.[141] Paramount counters that Plaintiffs' argument fails for three reasons. First, Paramount argues Plaintiffs' theory relies on factual findings regarding Redstone's actions from "stale lawsuits" as being probative of Redstone's conduct during the Merger.[142] Second, Paramount contends the supposed benefits Redstone received do not form a credible basis to infer wrongdoing.[143] Lastly, Paramount maintains the Director Departures, even considering the timing, are "insufficient to support a credible basis" to entitle Plaintiffs to inspect Informal Board Materials or Officer-Level Materials.[144]

1.    **This Court Has Already Held There Is a Credible Basis to Suspect Redstone Interfered With the Process**

The court has twice already held there is a credible basis to suspect Redstone may have been motivated to direct a sale of NAI over Paramount. First, in *Rhode Island I,* Vice Chancellor Laster considered another books-and-records demand regarding this Transaction and held "[t]he evidence provides a credible basis to suspect that Redstone responded to market interest in [Paramount] by diverting bidders to a parent-level transaction to the detriment of minority stockholders." 331 A.3d 179, 201 (Del. Ch. 2025). Senior

---

[141] Pls.' Opening Br. 25, 28.

[142] Def.'s Answering Br. 18.

[143] *Id.* 20.

[144] *Id.* 23.

Magistrate Molina, relying on *Rhode Island I,* made the same point three months later in *Gabelli*, ruling on an earlier books-and-records demand regarding this same Transaction:

> I find, as Vice Chancellor Laster found in [*Rhode Island I*], the record readily supports the inference that Ms. Redstone may have been motivated to direct a sale of NAI and perhaps did so . . . .
>
> Between the potentially unique benefits to Ms. Redstone from the merger, the support from the record that perhaps the sale process was driven by Ms. Redstone to ensure an ultimate outcome, and the apparent imbalance in favor of the NAI transaction, despite other opportunities, I find that the plaintiff has established a credible basis to suspect wrongdoing.

*Gabelli* Tr. 29–30 (paragraph break added).

Paramount does not address *Rhode Island I.* For *Gabelli*, it offers three reasons why, it says, the ruling in *Gabelli* does not control the credible basis inquiry here. It argues the *Gabelli* stockholder (1) was pursuing a different legal theory, (2) filed suit well before Paramount certified completion of its document productions, and (3) sought materials regarding different topics.[145] These distinctions are not meaningful. As to (1), "[a] demand does not have to articulate a specific legal theory." *Rhode Island I,* 331 A.3d at 190. And as to (2) and (3), they might, at best, impact whether the court should rely on *Gabelli*

---

[145] Def.'s Answering Br. 17.

to determine the appropriate scope of production. None of these reasons affects the credible basis inquiry.

The factual overlap between *Rhode Island I, Gabelli*, and this case cannot be seriously denied. I see no compelling reason to depart from the court's credible basis findings in *Rhode Island I* and *Gabelli*.

### 2. Plaintiffs Have a Credible Basis to Suspect the Merger Was a Conflicted Transaction

But even if *Rhode Island I* and *Gabelli* were not already pointing the way, I have considered the matter anew and find there is a credible basis to suspect the Merger was a conflicted transaction. Plaintiffs allege Redstone received three non-ratable benefits from the Merger: (1) Skydance purchased NAI in addition to acquiring Paramount; (2) the Merger would not break up Paramount, thereby "preserving the Redstone family legacy[;]" and (3) Skydance agreed to indemnify Redstone from liability arising from the Merger.[146] Plaintiffs maintain that, because Paramount was a "controlled company dominated by NAI and Redstone" and because Redstone received these three non-ratable benefits, Redstone favored a transaction with Skydance over superior bids.[147] Plaintiffs also point to the timing and reporting surrounding the Director Departures as additional evidence to support their

---

[146] Pls.' Opening Br. 26; Pls.' Reply Br. 6–12.

[147] Pls.' Opening Br. 26; Pls.' Reply Br. 6–12.

position.[148]  Paramount contends the alleged non-ratable benefits Redstone received are not enough to find a credible basis to suspect the Merger was unfair to other stockholders.[149]  As to the Director Departures, Paramount concedes a "noisy" director resignation can support a credible basis, but argues Seligman's, Ostroff's, and Terrell's resignations were not "noisy" so their departures do not give rise to a credible basis.[150]  Paramount is incorrect.

The evidence presented supports a credible basis that Redstone may have responded to proposals by scuttling ones she did not like or diverting bidders to a more favorable transaction that provided her more benefits.  First, the Paramount Certificate effectively gave Redstone a veto over any potential deal.[151]  So, although Redstone was not a member of the Special Committee, NAI and its controller cast a shadow over its work.  The record shows NAI, its attorneys, and Redstone had consistent contact with the Special Committee or its advisors and the Special Committee specifically considered transactions based on signals from Redstone and NAI about their positions on the proposed terms.[152]  The Special Committee meeting minutes explicitly state Redstone's preferences were considered and impacted the Special Committee's evaluation

---

[148] Pls.' Opening Br. 28; Pls.' Reply Br. 15–21.

[149] Def.'s Answering Br. 20.

[150] Def.'s Answering Br. 23–24.

[151] *See* Paramount Certificate.

[152] *See generally* Info. Statement.

of various proposals.[153]  This occurred even though the Special Committee was told it had authority to evaluate and reject all bids presented to it.[154]

The *New York Times* also reported, based on a series of interviews conducted with Redstone concurrently with the Merger negotiations, that Skydance agreed to "give Ms. Redstone additional payments amounting to hundreds of millions of dollars,"[155] and that Redstone "forced out [the] chief executive [officer] and four directors, upsetting two she had once numbered among her close friends."[156]  The article also reports Redstone was in "constant tension" with Paramount's independent directors, and she and other Paramount directors engineered the removal of those directors "to make it easier to get agreement."[157]   So, although Seligman, Ostroff, and Terrell did not state specific reasons for their departures, or otherwise make any "noise" with their departures, Redstone admitted they were forced out.[158]

The reporting also suggests Redstone may have received a non-ratable benefit.  In that same article, the *New York Times* reported "[a]lthough she

---

[153] *See, e.g.*, JX 12 ("Members of the Committee then shared their perspective, *including based on recent discussions with Shari Redstone*, that NAI would not support the [independent] sale of Paramount Pictures or other key assets . . . ." (emphasis added)).

[154] *See generally* Info. Statement.

[155] NYT Article 2.

[156] *Id.* 4.

[157] *Id.* 6, 9.

[158] *Id.* 8–10.

- 33 -

hadn't sold at anywhere near the top of the market . . . Redstone was pleased."[159] While Paramount is correct "providing protection to directors against future liability exposure does not automatically convey a non-ratable benefit[,]" whether a benefit is non-ratable is contextual. *Maffei v. Palkon*, 339 A.3d 705, 732–33 (Del. 2025). "A non-ratable benefit exists when the controller receives a unique benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders." *Id.* (quoting *City of Dearborn Police and Fire Revised Ret. Sys. v. Brookfield Asset Mgmt.*, 314 A.3d 1108, 1137 n.130 (Del. 2024)). In other words, the benefit must be "of sufficiently material importance" to the controller. *See id.* at 731–33. An item is "material" if it is "[o]f such a nature that knowledge of the item would affect a person's decision-making." *Material*, BLACK'S LAW DICTIONARY (12th ed. 2024).

In Redstone's statements to the *New York Times*, she expounded multiple times on feeling trapped by possible stockholder litigation and that she "just wanted to be free."[160] In this case, the record supports a credible basis finding that indemnification may have been uniquely material to Redstone such that it constitutes a non-ratable benefit.[161] Redstone and NAI's discussions and

---

[159] *Id.* 10.

[160] NYT Article 2–3.

[161] *See* JX 11 at 2–3; JX 12 at 2; WSJ Article at 2; JX 27 at 1–2; JX 28 at 1; JX 29 at 2–3; *see generally* Info. Statement.

representations to the Special Committee may also support a finding that a personal desire to keep Paramount together affected Redstone's decision-making and is therefore another non-ratable benefit to her.[162]

Plaintiffs have proven by a preponderance of the evidence there is a credible basis to suspect wrongdoing may have occurred. The fact that the Merger may have provided Redstone with non-ratable benefits, considered in tandem with Redstone's admission she forced out Special Committee members to make it easier for the board to approve a transaction, creates a credible basis for Plaintiffs to suspect possible wrongdoing. I conclude the Demands establish a credible basis to suspect wrongdoing, so they state a proper purpose for the inspection.

## C. Plaintiffs Are Entitled to Informal Board Materials Regarding the Director Departures

Having determined Plaintiffs have stated a proper purpose to investigate potential wrongdoing, I now address the scope of production. Plaintiffs seek Informal Board Materials and Officer-Level Materials concerning the Director Departures.[163]

"Where the stockholder's stated purpose is to inspect possible wrongdoing, the scope analysis has multiple dimensions. As an initial matter,

---

[162] When determining whether a controller received a non-ratable benefit, the "materiality" element is the key focus. *See Maffei*, 339 A.3d at 732.

[163] *See supra* notes 110, 125.

the court must consider the nature of the alleged wrongdoing that the stockholder seeks to investigate, *i.e.*, the who, what, where, when, and why of the possible wrongdoing." *Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *9 (Del. Ch. Aug. 31, 2022). "The scope of inspection is a fact-specific inquiry, and the court has broad discretion when conducting it." *Hightower*, 2022 WL 3970155, at *8. The inspecting stockholder "bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection" by a preponderance of the evidence. *Palantir*, 203 A.3d 738, 751 (Del. 2019) (quoting *Thomas & Betts*, 681 A.2d at 1035).

"Keeping in mind that Section 220 inspections are not tantamount to comprehensive discovery, the Court of Chancery must tailor its order for inspection to cover only those books and records that are 'essential and sufficient to the stockholder's stated purpose.' In other words, the court must give the petitioner everything that is essential, but stop at what is sufficient." *Roberta Ann K.W. Wong Leung Revocable Tr. U/A Dated 03/09/2018 v. Amazon.com, Inc.*, 2025 WL 3090985 (Del. Ch. Nov. 5, 2025) ("*Amazon III*") (quoting *Palantir,* 203 A.3d at 751–52). "Documents are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'" *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund*

*IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (quoting *Espinoza v. Hewlett–Packard Co.*, 32 A.3d 365, 371–72 (Del.2011)).

Corporate books and records have come to be classified into three general categories:

> 1. "Formal Board Materials," which are "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered";
>
> 2. "Informal Board Materials," which "generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings" and sometimes including "emails and other types of communication sent among the directors themselves, even if the directors used non-corporate accounts"; and
>
> 3. "Officer-Level Materials," which are "communications and materials that were only shared among or reviewed by officers and employees."

*Amazon III* at *3 (quoting *Hightower*, 2022 WL 3970155, at *9).[164] "Formal Board Materials are the starting point—and typically the ending point—for a sufficient inspection." *Amazon III*, at *3 (citing *Woods, Tr. of Avery L. Woods*

---

[164] The definitions of "Formal Board Materials," "Informal Board Materials," and "Officer-Level Materials" in the Demands largely tracks these definitions. *See supra* note 125.

*Tr. v. Sahara Enters., Inc.*, 2020 WL 4200131, at *11 (Del. Ch. July 22, 2020)).

The court does not order Informal Board Materials to be produced when Formal Board Materials would accomplish the stockholder's proper purpose. *Palantir*, 203 A.3d at 752–3. Informal Board Materials and Officer-Level Materials should only be produced if the Formal Board Materials are insufficient. *Id.*

Plaintiffs assert it is "critically important" for them to evaluate the effectiveness of the Special Committee and its work, and to do this "it is necessary to evaluate the circumstances of the Director Departures.[165] Plaintiffs say the existing record is "inadequate[,]" so Paramount must produce Informal Board Materials and Officer-Level Materials. Paramount disputes this. It calls Plaintiffs' request a "fishing expedition,"[166] and asserts that Plaintiffs have not met their burden to show Informal Board Materials and Officer-Level Materials are necessary and essential to their stated purpose.[167]

"Whether Formal Board Materials are sufficient for a stockholder's purposes is fact dependent, but generally speaking, a broader inspection may be needed if the board did not honor traditional corporate formalities, the alleged wrongdoing happened exclusively at the officer level, or the Formal Board Materials fail to address key events." *Amazon III* at *4 (citation omitted). This

---

[165] Pls.' Opening Br. 33; *see* Pls.' Reply Br. 25–30; Pls.' Suppl. Br. 7–8.

[166] Def.'s Answering Br. 4, 25–26, 30.

[167] *See* Def.'s Answering Br. 30–36.

is also true if there is "a discrepancy between public disclosures and [Formal] Board [M]aterials." *Operating Eng'rs Constr. Indus. & Misc. Pension Fund v. Pioneer Nat. Res. Co.*, 2025 WL 2106580, at *3 (Del. Ch. July 28, 2025).

Turning to the case at hand, the court has observed that "[t]he use of an independent special committee 'can serve as powerful evidence of fair dealing' if the special committee is truly independent and functions effectively.'" *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 535 (Del. Ch. 2024) (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)). To be effective, a special committee "must have real bargaining power that it can exercise with the majority shareholder on an arm[']s length basis." *Kahn v. Lynch Commc'ns Sys.*, 638 A.2d 1110, 1117 (Del. 1994) (citation omitted). This is important because "Delaware decisions have long worried about a controller's ability to take retributive action against outside directors if they did not support the controller's chosen transaction and whether it could cause the outside directors to support a deal that was not in the best interests of the company or its stockholders." *Sears Hometown*, 309 A.3d at 537 (citations omitted). A controller making retributive threats "is evidence of unfair dealing," and when the controller goes beyond threats and actually removes opposing directors, it "cast[s] a shadow over the balance of negotiations." *Id.*

In the pretrial briefing, Plaintiffs framed the dispute over the Director Departures and their impact on the Merger process in a useful way, arguing there are three questions that need to be answered:

- Did the [Special] Committee members jump or were they pushed?

- What caused them to resign (if they resigned)?

- What caused NAI to push them out (if NAI pushed them out)?[168]

Paramount's position, as reflected in the Formal Board Materials,[169] its pretrial brief,[170] and its argument at trial,[171] is to deny the first question—the departing directors were not pushed out, they just decided not to continue their service. And if the rest of the record were simply silent on the Director Departures, maybe Paramount's argument this is just a "fishing expedition" would have some force.

But the rest of the record is not silent. Instead, there is evidence that not only fills the silence, but contradicts Paramount's recounting of events. That

---

[168] Pls.' Opening Br. 5; Pls.' Reply Br. 29.

[169] *See* JX 13 at 2 (Special Committee meeting minutes stating "that certain directors would not be standing for re-election at [Paramount]'s 2024 Annual Meeting of Stockholders.").

[170] *See* Def.'s Answering Br. 33 (quoting JX 13 at 2).

[171] Trial Tr. 34 ("[N]o one was removed from the board, it was the decision not to re-run.").

evidence, of course, is the *New York Times* Article.[172] In that article, based on a series of on-the-record interviews with Redstone, Redstone admits that she forced Seligman, Ostroff, and Terrell out of Paramount (and thus off the Special Committee), and that she has been working since then to smooth things over with Seligman and Ostroff.[173] This is a strikingly different portrait of what happened than the Formal Board Materials' anodyne statement that the directors simply left "in anticipation of not standing for re-election" at the 2024 annual meeting.

But this narrative conflict is not the end of things. The *New York Times* Article answers the "what happened?" question—the directors were pushed out. It does not answer the third question Plaintiffs identify in their pretrial briefs: why did it happen? The *New York Times* Article says Redstone thought some of the Special Committee members were "too cautious about allowing potential bidders access to Paramount's books" and "too worried about getting sued."[174] So, she forced these directors out and reduced the size of the board "to make it easier to get [an] agreement."[175] But agreement as to what? Was Redstone

---

[172] The *New York Times* Article is the only exhibit to which Paramount maintained its hearsay objection. *Compare* Dkt. 47 at 2 (excluding the *New York Times* article from the list of waived hearsay objections), *with* Dkt. 32 Ex. A (identifying Paramount's evidentiary objections).

[173] NYT Article 4, 9.

[174] *Id.* 9.

[175] *Id.*

simply looking to lessen the discord as the Special Committee went about its business?  Or did Redstone act because these directors were a roadblock to a particular deal she wanted to see happen?  The *New York Times* Article does not say.[176] The Formal Board Materials do not say.[177] Answers must be sought elsewhere.

The record considered as a whole, including the *New York Times* and *Wall Street Journal* Articles, establishes that the Formal Board Materials either fail to address or do not accurately describe the Director Departures. Production of Informal Board Materials regarding the Director Departures is thus necessary and essential to satisfy Plaintiff's proper purpose.[178]

## D.	Plaintiffs Are Not Entitled to Officer-Level Materials Regarding the Director Departures

Plaintiffs have failed to prove Officer-Level Materials are necessary and essential to their investigation.  Plaintiffs do not allege that any of Paramount's officers played a key role in the Merger negotiations, advising the Special Committee, or that the officers engaged in any possible misconduct.[179]  From Plaintiffs' own allegations, there is no reason to infer Paramount's officers had

---

[176] The *Wall Street Journal*, though, reported one of the departing directors "expressed concerns about the potential Skydance deal[.]"  WSJ Article 2.

[177] *See* JX 13.

[178] *See Palantir*, 203 A.3d at 752–57 (Del. 2019) (discussing when and in what circumstances Informal Board Materials are necessary and essential to a stockholder's inspection purpose).

[179] *See generally* Pls.' Opening Br.

- 42 -

any involvement or would possess any information related to the Director Departures. It appears Plaintiffs recognized this deficiency as well, as their opening and reply briefs address communications between Paramount's directors but lack any similar argument as to its officers.[180] Plaintiffs have not met their burden here, and their requests for Officer-Level Materials should be denied.

## III. CONCLUSION

Plaintiffs have established a credible basis to investigate mismanagement or wrongdoing. Plaintiffs have also established Informal Board Materials regarding the Director Departures are necessary and essential to their stated purpose for inspection. They have not demonstrated Officer-Level Materials regarding the Director Departures are necessary and essential. This is a Final Report under Court of Chancery Rule 144(b)(2). Exceptions may be taken pursuant to Rule 144(d).

---

[180] Pls.' Opening Br. 30–38; Pls.' Reply Br. 29–30.